09-4371-cv (L)
Cash v. Cnty. of Erie

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: September 2, 2010    Decided: August 18, 2011)

Docket Nos. 09-4371-cv (L), 09-4707-cv (XAP)

VIKKI CASH,

*Plaintiff-Appellant-Cross-Appellee*,

—v.—

COUNTY OF ERIE, PATRICK GALLIVAN, Sheriff,

*Defendants-Cross-Claimant-Appellees-
Cross-Appellants*,

MARCHON HAMILTON,

*Defendant-Cross-Defendant*.[*]

Before: JACOBS, *Chief Judge,* RAGGI, *Circuit Judge*, RAKOFF, *District Judge.*[**]

---

[*] The Clerk of Court is directed to amend the caption to read as shown above.

[**] District Judge Jed S. Rakoff of the United States District Court for the Southern District of New York, sitting by designation.

1

Appeal from a judgment entered in favor of defendants in the United States District Court for the Western District of New York (Jeremiah J. McCarthy, *Magistrate Judge*) notwithstanding a jury verdict in favor of plaintiff on her 42 U.S.C. § 1983 claim for a violation of due process arising from her sexual assault by a sheriff's deputy while in pretrial detention at a county correctional facility. Defendants cross-appeal charging errors in the special verdict form and inconsistent jury verdicts.

REVERSED and REMANDED.

Chief Judge Jacobs dissents in a separate opinion.

---

EUGENE B. NATHANSON, Esq., New York, New York, *for Plaintiff-Appellant-Cross-Appellee*.

THOMAS F. KIRKPATRICK, JR., Erie County Department of Law, Buffalo, New York, for *Defendants-Cross-Claimant-Appellees-Cross-Appellants*.

---

REENA RAGGI, *Circuit Judge*:

It is undisputed that while held in pretrial confinement at the Erie County Holding Center ("ECHC"), plaintiff Vikki Cash was sexually assaulted by a male sheriff's deputy, Marchon Hamilton. At issue on this appeal is whether Cash adduced sufficient evidence of municipal liability for this violation of due process to support a jury verdict returned in her favor against Erie County and its then-policy maker, former County Sheriff Patrick Gallivan,

in the amount of $500,000.  See 42 U.S.C. § 1983.[1]  Arguing that she did carry this evidentiary burden, Cash appeals from a judgment entered in the United States District Court for the Western District of New York (Jeremiah J. McCarthy, *Magistrate Judge*) in favor of defendants notwithstanding the verdict.  The County and Sheriff Gallivan defend the challenged judgment in their favor and, in the alternative, cross-appeal charging that errors in the special verdict form and inconsistent jury verdicts require a new trial.  We identify merit in Cash's appeal but not in defendants' cross-appeal and, accordingly, we reverse the judgment in favor of defendants and remand the case for entry of judgment in favor of Cash consistent with the jury verdict.

## I.       Background

### A.       The Instant Complaint

On December 10, 2003, Cash sued Erie County, the Erie County Sheriff's Department, and Sheriff Gallivan in his official capacity, as well as  Deputy Hamilton, in New York State Supreme Court for injuries sustained as a result of Hamilton's sexual assault on December 17, 2002.  Cash asserted, inter alia, (1) a federal due process claim under 42 U.S.C. § 1983, and (2) a New York state law claim for negligence.  On March 19, 2004, defendants removed the action to federal court, where it was assigned to District Judge John T. Curtin.  See 28 U.S.C. §§ 1441(b), 1446.

---

[1] Not at issue on this appeal is a default judgment entered against Deputy Hamilton for $500,000 in compensatory damages and $150,000 in punitive damages.  See Cash v. Cnty. of Erie, No. 04 Civ. 182, 2009 WL 3199558 (W.D.N.Y. Sept. 30, 2009).  Accordingly, we do not discuss that judgment further.

Following discovery, defendants and Cash cross-moved for summary judgment. The district court dismissed Cash's complaint against the Sheriff's Department because it was not a municipal entity distinct from the County, and her claim for punitive damages against the County and Gallivan. See Cash v. Cnty. of Erie, No. 04 Civ. 182, 2007 WL 2027844, at *6 (W.D.N.Y. July 11, 2007).[2] In all other respects, the district court denied the parties' summary judgment motions in light of disputed issues of fact as to municipal liability. See id. at *4-5.

Pursuant to 28 U.S.C. § 636(c)(1), the parties consented to trial before a magistrate judge, prompting reassignment to Magistrate Judge Jeremiah McCarthy.

B.     Trial

1.     Evidence Adduced

a.     The Charged Sexual Assault

Trial evidence revealed that on December 17, 2002, while Cash was a pretrial detainee in a female housing unit at ECHC, Deputy Hamilton, acting alone, escorted some female detainees to the recreation center but ordered Cash to remain behind. When Hamilton returned, he grabbed Cash, put his hands over her nose and mouth, forced her into the deputies' bathroom, and raped her.

Cash reported the assault the next morning, prompting an investigation that led to Hamilton's arrest for first-degree rape in violation of New York Penal Law § 130.35.

_____

[2] Hereafter, "defendants" refers to those before the court on this appeal, i.e., Erie County and Sheriff Gallivan.

Hamilton was suspended without pay and eventually pleaded guilty to third-degree rape in violation of New York Penal Law § 130.25, after which he resigned his deputy position. Because defendants did not dispute Hamilton's rape of Cash, the parties' focus at trial was on whether a County policy caused the assault. See generally Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692-94 (1978). On that point, considerable attention was given to the policies that defendants implemented to protect prisoners from sexual exploitation and defendants' awareness of past sexual misconduct by prison guards notwithstanding such policies. Expert testimony was also received as to accepted deterrent practices at other correctional facilities.

b.      Defendants' Policies To Avoid Sexual Misconduct at ECHC

Defendants submitted that, at the time of Cash's rape, policies were in place to prevent such an assault. As Sheriff Gallivan testified at trial, "[a] deputy was prohibited from having any type of relationship, intimate relationship with an inmate. A deputy was prohibited from having any physical contact with an inmate unless authorized by law in the case of justifiable use of force or preventing death or serious injury." Trial Tr. at 451. These proscriptions are, in fact, mandated by New York state law, which deems persons in the custody of a state or local correctional facility "incapable of consent" to sexual conduct with facility employees. N.Y. Penal Law § 130.05(3)(e)-(f). Persons who engage in sexual intercourse with persons incapable of consent are criminally culpable for third degree rape, see id. § 130.25; persons who engage in any sexual contact with persons incapable of consent are criminally culpable for second degree sexual abuse, see id. § 130.60.

5

Further, ECHC policy required that at the start of a new shift, a deputy of one sex announce his or her presence on a unit housing prisoners of another sex. No such announcement was required, however, when a deputy conducted periodic unannounced inspections of housing units, during which prisoners undressing, showering, or using the toilets might be viewed naked. No County policy prohibited a single deputy of one sex from being alone with a prisoner of another sex. Nor were any monitoring devices, such as surveillance cameras, ever employed to supervise such one-on-one interactions.

c.      Defendants' Awareness of Past Sexual Misconduct

Sheriff Gallivan testified that in the years 1998 through 2002, approximately 85,000 prisoners passed through ECHC. See Trial Tr. at 674. In that time, prior to Cash's rape, he "only kn[e]w of one" complaint of sexual misconduct involving a male deputy and female detainee at ECHC. Id. at 347.[3] That earlier complaint apparently pertained to events that

_____

[3] Cash's attorney was permitted to impeach this testimony with Gallivan's December 2006 deposition, wherein he acknowledged an awareness of multiple "allegations" of sexual assault or abuse by male guards of female prisoners at ECHC during his tenure, but professed to lack "a specific recollection of any individual specific case or whether [the allegations] are founded." Gallivan Dep. at 37-38 (emphasis added). Asked whether the complaints numbered more than five or more than twenty, Gallivan replied, "I can tell you it's not more than a thousand. I don't care to estimate. I don't believe it would be more than twenty." Id. at 39. Gallivan could not then recall if the allegations were made before or after Cash's December 17, 2002 rape. However curious it might seem that the sheriff could not remember whether, after an assault that resulted in one of his deputies being charged with first-degree rape, he continued to hear allegations of male guards engaging in proscribed sexual contact with female prisoners, the record shows that when Gallivan was confronted at trial with his deposition reference to multiple "allegations," he maintained a present awareness of only one complaint before Cash's rape. Trial Tr. at 350-53.

Cash argues that the district court erred in not allowing her to put Gallivan's entire deposition testimony with respect to such allegations before the jury, on the ground that she

6

occurred in mid-January 1999 with respect to another female pretrial detainee at ECHC, Elizabeth Allen. Although Gallivan testified that he could not recall the details of the Allen complaint, he acknowledged that relevant findings would have been reported to him. This was in fact confirmed by documentary evidence addressed or copied to Gallivan.

This documentary evidence revealed an internal affairs investigation of Allen's claim that on or about January 15, 1999, a male guard, Deputy Gary Morgan, had engaged her in sexual intercourse, and that she had a condom to prove it. When interviewed, Allen revised her account, stating that while alone with Deputy Morgan, the two had engaged in various sexual acts just short of intercourse for which she expected to receive extra commissary items. Allen alleged that she had previously engaged in sexual activity with Morgan, as well as other guards, but lacked any corroborating physical evidence of such encounters. She further reported that, on a number of occasions, she exposed her breasts and fondled herself in front of male guards in exchange for cigarettes or other commissary items.

When questioned, Morgan initially falsely stated that he had allowed Allen out of her cell on January 15, 1999, in violation of her "keep-lock" status, simply to allow her to retrieve cleaning equipment, and that no sexual activity occurred at that time. He later revised this account, stating that when released from her cell, Allen had exposed herself to him, which he knew she had a history of doing in front of male guards. He stated that, in the

_____

could not show that more than one complaint was in fact received before her rape. She contends that if the trial evidence was insufficient to support the jury verdict, this error warrants a new trial. We need not decide this evidentiary challenge because, as we explain below, the evidence was sufficient to support the verdict in favor of Cash.

7

course of trying to return Allen to her cell, he "may" have touched her breasts but insisted that any such contact was unintentional and not sexual.

The Allen investigation report, addressed to Gallivan, was skeptical of Morgan's denial and found "likely . . . sexual contact" between the guard and Allen. Mem. from Thomas Staebell to Patrick Gallivan, Case Report #99-09: On-Duty Conduct of Deputy Gary Morgan 1 (Apr. 1, 1999). Nevertheless, the report determined that such a charge could not be sustained in light of Allen's questionable veracity. The report concluded that Morgan could be found clearly to have violated ECHC policy only with respect to allowing a keep-lock prisoner out of her cell, failing to report Allen's exhibitionist behavior, and lying to investigators at his initial interview. It recommended thirty days' suspension. Instead, the Sheriff's Department suspended Morgan for only three days, which punishment he was permitted to satisfy by surrendering three days of compensatory time. The department cautioned Morgan that repetition of the conduct at issue could result in harsher discipline, including dismissal.

Gallivan testified that on March 11, 1999, in response to the Allen complaint and "highly publicized incidents" at other New York correctional facilities, Trial Tr. at 383, ECHC Superintendent H. McCarthy Gipson issued a one-page memorandum entitled "Sexual Conduct," reminding facility personnel of ECHC's "no-contact" policy. The memorandum stated as follows:

8

Sexual conduct between Staff and Inmates is STRICTLY PROHIBITED, by the New York State Penal Law Article 130.[4] Per the NYS Penal Law, inmates are not capable of consenting to any type of sexual conduct between an employee exercising authority over them. The only permissible conduct is that which is within the scope of your regular duties and would not be considered sexual in nature.

The Erie County Holding Center encourages peer and supervisory reporting. Any Holding Center employee with information concerning inappropriate conduct, (other than criminal), on the part of another employee is encouraged to bring this to the attention of an appropriate supervisor. Wrongful conduct could be an embarrassment to the entire department. Furthermore, early discovery and intervention on the part of supervision could prevent further misconduct and decrease administrative sanctions.

. . .

Any reports of misconduct will be thoroughly investigated.

Mem. from H. McCarthy Gipson to ECHC Personnel (Mar. 11, 1999) ("Gipson Memorandum"). Gallivan explained that the Gipson Memorandum was issued to "prevent what happened in other facilities from happening at the holding center," Trial Tr. at 470, and "to make clear to people [that] even though you've been trained in the policy and procedure, even though you know these things exist, be assured that it cannot take place, we will do something about it," id. at 384.

_____

[4] The Memorandum defined "sexual conduct" expansively to include the following:

Physical contact (except for required duties),
Intimate contact
ANY Sexual contact
Crude, sexual comments
Touching
Inappropriate touching during searches
Fondling
Observing inmates naked (except for required duties)
Encouraging inmates to show their body or do lewd acts
Any other behavior as it pertains to the Holding Center Code of Conduct, #HC 03.03.00.

9

### d. Expert Testimony Regarding Accepted Practices To Deter Sexual Misconduct

Thomas Frame, a corrections consultant who had worked as a Pennsylvania prison warden for twenty-four years, testified for Cash as an expert witness. Frame pronounced it "bad policy" for ECHC to allow male guards to be alone and unmonitored with female prisoners. Id. at 531. He explained that such a practice jeopardized the safety of female prisoners because the male guard "has authority over the inmate and . . . can direct that inmate to do almost anything he wants." Id. at 532. Frame testified that "good and accepted practice" is to pair a female officer with a male officer whenever direct interaction with a female prisoner is required. Id. at 533. He further testified that the Allen complaint should have alerted defendants to the need for such a policy. See id. Frame opined that the Gipson Memorandum was an inadequate response to the Allen complaint because it failed to "remove the situation" posing a risk to female prisoners, i.e., allowing a single unmonitored male deputy to interact with female prisoners. Id. at 534. Defendants offered no contrary expert opinion.

### 2. Jury Charge and Verdict

Upon the close of evidence, defendants moved for judgment as a matter of law. See Fed. R. Civ. P. 50. The district court reserved decision and proceeded to charge the jury. With respect to the § 1983 claim, the district court instructed that defendants could not be held liable for constitutional violations by Deputy Hamilton merely because he was a County employee. Rather, to establish municipal liability, Cash had to prove "by a preponderance

10

of the evidence that the actions of Marchon Hamilton . . . [were] the result of an official policy, practice or custom." Trial Tr. at 1009. The court explained that such a policy, practice, or custom did not have to be in writing or formally adopted. The court stated that Sheriff Gallivan was the relevant County policymaker with respect to ECHC, a point conceded by defendants.

The district court instructed that a "policy" could be found if the evidence showed a failure to "supervise their subordinates amounting to deliberate indifference to the rights of those who came in contact with municipal employees." Id. at 1010. "Mere negligence" was insufficient to establish deliberate indifference. Id. Rather, deliberate indifference required a showing that Gallivan "knew of and disregarded an excessive risk to the plaintiff's health and safety." Id. With respect to causation, the court instructed that Cash must prove that defendants' actions or inaction were the "proximate cause" of her injury, i.e., that they were "a substantial factor in bringing about [her] injury" and that such injury "was a reasonably foreseeable consequence" of defendants' conduct. Id. at 1011.

A special verdict form asked the jury sequentially to consider three questions relevant to the § 1983 claim: (1) "Did Marchon Hamilton violate Vikki Cash's right to personal security guaranteed by the Due Process Clause of the Fourteenth Amendment of the Constitution on December 17, 2002?"; if so, (2) "Was the violation of her constitutional rights proximately caused by a custom, policy, or practice of the County of Erie?"; and, if so, (3) "Did Vikki Cash suffer injury as a result of the violation of her constitutional rights?" Special Verdict Form at 1-2. As to the negligence claim, the verdict form asked: (4) "Was

11

former Sheriff Patrick Gallivan negligent?"; and, if so, (5) "Did Vikki Cash suffer injury that was proximately caused by former Sheriff Patrick Gallivan's negligence?" Id. at 2-3. Finally, if the jury found in favor of Cash on either the federal or state claim, the verdict form required the jury to "[s]tate the amount of damages that you award to compensate Vikki Cash for [her] injury from December 17, 2002, the date of the incident, through today." Id. at 3.

On September 26, 2008, the jury answered all three questions pertaining to the § 1983 claim in the affirmative, but found that Sheriff Gallivan was not negligent. See Trial Tr. at 1032-33. The jury awarded Cash $500,000 in compensatory damages. See id. at 1034.

C.      Post-trial Motions and Judgment

Before the jury was discharged, the district court inquired whether either party had any motions as to the verdict. When defendants sought additional time to consider post-trial motions, the court asked if they had "any motions directly relevant to the verdict before [it] discharge[d] the jury." Id. at 1035. Defendants' counsel responded: "Not at this time." Id. On December 22, 2008, defendants renewed their motion for judgment as a matter of law, see Fed. R. Civ. P. 50, and moved, in the alternative, for a new trial, see Fed. R. Civ. P. 59.

On March 10, 2009, the district court granted defendants' Rule 50 motion and denied their Rule 59 motion as moot. See Decision & Order, Cash v. Cnty. of Erie, No. 04 Civ. 182 (W.D.N.Y. Mar. 10, 2009). The court determined that, although ample evidence supported the existence of a County policy permitting male deputies to be alone and unmonitored with female prisoners at ECHC, that policy was not itself unconstitutional. Further, the court determined that Cash had failed to adduce sufficient evidence of prior incidents of sexual

12

assault by male guards of female prisoners at ECHC to place Sheriff Gallivan and the County on notice that such a policy presented a substantial risk of sexual harm to female prisoners. Absent such evidence, the district court concluded that the record failed as a matter of law to support a reasonable jury finding of deliberate indifference. Accordingly, the district court set aside the jury's verdict and entered judgment in favor of defendants.

These cross-appeals followed.

## II.   Discussion

### A.   Defendants Were Not Entitled to Judgment As a Matter of Law

#### 1.   Standard of Review

We review de novo a district court's decision to grant a Rule 50 motion for judgment as a matter of law, see Kinneary v. City of New York, 601 F.3d 151, 155 (2d Cir. 2010), applying the same standard as the district court, see Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007). That standard generally imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1); see generally Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). That burden is "particularly heavy" where, as here, "the jury has deliberated in the case and actually returned its verdict" in favor of the non-movant. Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005). In such circumstances, a court may set aside the verdict only "if there exists such a complete absence of evidence supporting the verdict that the jury's

13

findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." Kinneary v. City of New York, 601 F.3d at 155 (internal quotation marks and brackets omitted). In short, a Rule 50 motion may be granted only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that "a reasonable juror would have been compelled to accept the view of the moving party." Zellner v. Summerlin, 494 F.3d at 371 (internal quotation marks omitted; emphasis in original); see Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992). That is not this case.

### 2. Municipal Liability Under § 1983

Title 42 U.S.C. § 1983 states in pertinent part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

A municipality may be liable under § 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. at 692). In other words, municipalities are "responsible only for 'their own illegal acts,'" and cannot be held "vicariously liable under § 1983 for their employees' actions." Id. (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986))

14

(emphasis in <u>Pembaur</u>); <u>see</u> <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 36-37 (2d Cir. 2008) (holding that municipality cannot be held liable under § 1983 for acts of its employees under doctrine of <u>respondeat superior</u>).  Rather, a "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  <u>Roe v. City of Waterbury</u>, 542 F.3d at 37 (quoting <u>Board of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 404 (1997)).  In short, to establish municipal liability under § 1983, a plaintiff must prove that "action pursuant to official municipal policy" caused the alleged constitutional injury.  <u>Connick v. Thompson</u>, 131 S. Ct. at 1359 (internal quotation marks omitted); <u>see</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989).

A municipal policy may be pronounced or tacit and reflected in either action or inaction.  In the latter respect, a "city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution."  <u>Connick v. Thompson</u>, 131 S. Ct. at 1360 (internal quotation marks omitted); <u>see also</u> <u>City of Canton v. Harris</u>, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of <u>Monell</u> are satisfied.").  Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983."  <u>Amnesty</u>

15

Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) (internal quotation marks omitted).

As the Supreme Court has cautioned, "deliberate indifference" is "'a stringent standard of fault,'" Connick v. Thompson, 131 S. Ct. at 1360 (quoting Board of Cnty. Comm'rs v. Brown, 520 U.S. at 410), and necessarily depends on a careful assessment of the facts at issue in a particular case, see generally Amnesty Am. v. Town of W. Hartford, 361 F.3d at 128 (holding that deliberate indifference determination "need not rely on any particular factual showing"). The operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of "conscious choice" and not "mere negligence." Id. (internal quotation marks omitted); see City of Canton v. Harris, 489 U.S. at 389. Thus, deliberate indifference may be inferred where "the need for more or better supervision to protect against constitutional violations was obvious," Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995), but the policymaker "fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs," Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007); see also Board of Cnty. Comm'rs v. Brown, 520 U.S. at 407 (holding that deliberate indifference requires proof that "municipal actor disregarded a known or obvious consequence of his action" (internal quotation marks omitted)); Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) (framing deliberate indifference inquiry in three parts: (1) policymaker knows "to a moral certainty" that its employees will confront a given situation; (2) either situation presents employees with difficult choice that will be made less so by training or supervision, or there is a record of employees mishandling situation; and

16

(3) wrong choice by employees will frequently cause deprivation of constitutional rights (internal quotation marks omitted)).

          3.     <u>Trial Evidence Was Not Insufficient as a Matter of Law To Permit a Reasonable Jury To Find Municipal Liability Based on Deliberate Indifference</u>

In moving for Rule 50 relief from the jury verdict in favor of Cash, defendants did not dispute that Cash's constitutional right to due process was violated when, while in pretrial confinement at ECHC, she was raped by a guard; that the guard was then acting under color of state law; or that Sheriff Gallivan was the relevant policymaker for purposes of assessing municipal liability. Defendants' motion thus focused on a single issue: the sufficiency of the evidence to demonstrate that Gallivan acted with deliberate indifference to the risk that Cash would be sexually assaulted by an unmonitored guard.

In assessing defendants' sufficiency challenge, we review the trial evidence not only in the light most favorable to Cash, <u>see</u> <u>Zellner v. Summerlin</u>, 494 F.3d at 371, but also mindful that defendants operated under an "affirmative duty to protect those held in their custody," <u>Villante v. Dep't of Corr.</u>, 786 F.2d 516, 519 (2d Cir. 1986); <u>cf.</u> <u>DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."); <u>Caiozzo v. Koreman</u>, 581 F.3d 63, 69 (2d Cir. 2009) ("[A] person detained prior to conviction receives protection against mistreatment at the hands of prison officials under . . . the Due Process Clause of the Fourteenth Amendment if held in state custody.").

17

The existence of an affirmative duty to protect does not mean that any harm that befalls a person in state custody necessarily manifests a municipal policy of deliberate indifference to prisoner safety. But an affirmative duty, by its nature, implies a proactive responsibility to assess the risks of harm presented by given circumstances and to take reasonable preventive measures in advance of harm occurring, not simply to respond to harms only after they occur. Cf. Farmer v. Brennan, 511 U.S. 825, 845 (1994) (observing that deliberate indifference showing in parallel Eighth Amendment context "does not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault before obtaining relief" (internal quotation marks and brackets omitted)).

In this case, defendants cannot claim that the evidence was insufficient to alert them to the risk of sexual exploitation posed by male deputies guarding female prisoners at ECHC. That risk is acknowledged in New York state law, which pronounces prisoners categorically incapable of consenting to any sexual activity with guards, see N.Y. Penal Law § 130.05(3)(e)-(f), and subjects guards to criminal liability for such conduct, see, e.g., id. §§ 130.25(1), 130.60(1). In short, these laws recognize the moral certainty of guards confronting prisoners in sexually tempting circumstances with such a frequent risk of harm to prisoners as to require a complete prohibition on any sexual activity. See generally Walker v. City of New York, 974 F.2d at 297-98.[5] Thus, the question presented by this case

_____

[5] The specific criminalization of any sexual activity between guards and prisoners distinguishes the municipal liability assessment in this case from others hypothesized by our dissenting colleague, see Dissenting Op., post at **[5]**, where policymakers can confront sexual abuse claims in contexts admitting the possibility for consensual—or at least non-

18

is not whether defendants should have realized the need for such a prohibition, but whether defendants could rely simply on guards' awareness of these criminal laws (and ECHC policies implementing them) to deter sexual exploitation of prisoners, or whether defendants had reason to know that more was required to discharge their affirmative protective duty, specifically, precluding or at least monitoring one-on-one contact between guards and prisoners.

In concluding that trial evidence was legally insufficient to support the latter finding, the district court observed that a policy permitting unmonitored one-on-one interactions between a guard and a prisoner of different sexes was not itself unconstitutional, and that the lack of prior sexual <u>assaults</u> by male guards of female prisoners failed to alert Gallivan to the fact that such a policy posed a risk of rape to Cash. We take no exception to the district court's first observation, <u>see generally</u> <u>Hovater v. Robinson</u>, 1 F.3d 1063, 1068 (10th Cir. 1993) (rejecting "conclusion that every male guard is a risk to the bodily integrity of a female inmate whenever the two are left alone"), but we cannot agree with its second.

To explain, we begin by noting that the pattern ordinarily necessary to prove deliberate indifference in the context of a failure-to-train claim does not neatly transfer to this case. <u>See generally</u> <u>Connick v. Thompson</u>, 131 S. Ct. at 1359 (observing that "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train"). A duty to train arises so that subordinates entrusted with the discretionary exercise

_____

criminal—interaction between the parties in question. Thus, far from being unbounded, this decision is cabined by the particular context of a no-tolerance policy backed by criminal law.

19

of municipal power can distinguish between lawful and unlawful choices. Because the exercise of such discretion can arise in myriad circumstances, the "nuance" of a particular training need may only become apparent to municipal policymakers after a pattern of violations arises in substantially similar circumstances. Id. at 1363. The same conclusion obtains with respect to the need to supervise subordinates who must make a range of discretionary choices in the exercise of delegated municipal power.

The deliberate indifference concern in this case, however, is not with a failure to train prison guards to distinguish between permissible and impermissible sexual contact with prisoners. Nor is it with providing sufficient supervision to ensure that guards make correct choices in this respect. New York affords guards no discretion respecting sexual contact with prisoners; the state's proscription of such contact is absolute. Thus, the deliberate indifference concern here is with the adequacy of defendants' own actions to prevent sexual contact between guards and prisoners consistent with their affirmative duty to protect prisoners in their custody.

Mindful of this affirmative duty to protect, a reasonable jury could have concluded that the 1999 Allen complaint would have alerted Gallivan to the fact that mere proscriptions on sexual contact between guards and prisoners had proved an insufficient deterrent to sexual exploitation. The Allen investigation report indicated, at best, that a female prisoner repeatedly had engaged in sexual exhibitionism before various guards, none of whom had reported the activity and some of whom may have paid for it with commissary items. At worst, the report indicated that male guards had engaged a female prisoner in a variety of

20

more intimate sexual activities. Indeed, investigators indicated that, despite Allen's dubious credibility, they thought it likely that such prohibited sexual activity had in fact occurred in Allen's case. A jury could have concluded that this investigative determination should have alerted defendants that they could not rely simply on guards' awareness of a no-tolerance policy to deter sexual misconduct. Likewise, a jury could have determined that Gallivan's conceded awareness of "highly publicized incidents" at other New York correctional facilities should further have alerted him to the inadequacy of a mere proscriptive policy to deter guards' sexual misconduct.

In concluding otherwise, the district court noted that Cash had been sexually assaulted, and there was no evidence that the Allen incident or those arising in other institutions were assaultive. This reasoning overlooks the fact that, as a matter of New York state law, any sexual contact between a guard and a prisoner is deemed non-consensual due to the inherent power differential between guards and prisoners. See N.Y. Penal Law § 130.05(3)(e)-(f); Morris v. Eversley, No. 00 Civ. 8166, 2004 WL 171337, at *1 (S.D.N.Y. Jan. 29, 2004) (Chin, J.) ("The law presumes that even if an inmate says 'yes,' she is doing so not because she wants to, but because the disparity in power makes it impossible for her to say 'no.'"). State law draws no distinction between assaultive and non-assaultive sexual activity in the prison context; it tolerates neither.[6] Defendants were thus obligated to do the same in carrying out their affirmative duty to protect prisoners from harm.

---

[6] This court has previously recognized that sexual abuse of a prisoner by a corrections officer short of sexual assault may, in some circumstances, violate the prisoner's right to be free from cruel and unusual punishment. See Boddie v. Schnieder, 105 F.3d 857, 860-61 (2d Cir. 1997); accord United States v. Walsh, 194 F.3d 37, 49 (2d Cir. 1999).

21

Accordingly, even if Gallivan had no knowledge of prior sexual assaults, it was hardly speculative for a jury to conclude that, at least by 1999, he knew or should have known that guards at ECHC and other local correctional facilities were engaging in proscribed sexual contact with prisoners, and that continued reliance on penal proscriptions alone was insufficient to protect prisoners from the range of harms associated with such misconduct, of which rape is obviously the most serious example. See Walker v. City of New York, 974 F.2d at 297 (observing that even where need for different policy "would not be obvious to a stranger to the situation, a particular context might make the need for training or supervision so obvious that a failure to do so would constitute deliberate indifference"); see also Gonzales v. Martinez, 403 F.3d 1179, 1187 (10th Cir. 2005) (holding that evidence of prior non-sexual physical assaults, lapses in jail security, and sexual harassment and intimidation by guards was sufficient to support reasonable inference that sheriff was aware of risk of sexual assault to female inmates to sustain Eighth Amendment deliberate indifference claim). In the context of such an absolute proscription and a duty to protect, knowledge that an established practice has proved insufficient to deter lesser misconduct can be found to serve notice that the practice is also insufficient to deter more egregious misconduct. Cf. Amnesty Am. v. Town of W. Hartford, 361 F.3d at 128 (observing that "evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious" (internal quotation marks omitted)).[7]

---

[7] The dissent contends that by framing the known risk as one of sexual exploitation rather than sexual assault, this opinion employs "general and expansive" terms

22

In fact, defendants themselves recognized a need for some response to the 1999 incidents at ECHC and other state correctional facilities. This was evidenced by issuance of the Gipson Memorandum. The jury might have inferred therefrom that defendants were not indifferent to the problem of sexual misconduct by guards, but it was not compelled to do so. In making a deliberate indifference assessment, the jury was entitled to rely on unrebutted expert testimony that the Gipson Memorandum's reiteration of existing law and ECHC policy was inadequate to protect female prisoners from sexual harm. Indeed, Gallivan himself conceded at trial that the "no-contact" policy referenced in the Gipson Memorandum had been in place at ECHC prior to 1999, yet had failed to prevent the sexual misconduct referenced in the Allen report. See Trial Tr. at 692. As the Supreme Court recently reiterated, "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." Connick v. Thompson, 131 S. Ct. at 1360 (internal quotation marks omitted). That observation, made with reference to a claim of inadequate training, applies with no less force to a supervision claim, particularly where defendants operate under

_____

"incompatible" with recognition that unmonitored one-on-one interactions between male guards and female prisoners are not inherently unconstitutional. See Dissenting Op., post at **[2 & n.1]**. The identified risk, however, derives from New York law, which criminalizes all sexual activity between guards and prisoners as non-consensual. This hardly means that a municipality can never permit one-on-one interactions between male guards and female prisoners without giving rise to potential Monell liability, much less "strict liability" as the dissent claims. Rather, the relevant inquiry is whether in a particular case policymakers had reason to know that guards were taking advantage of one-on-one interactions to engage in criminal sexual conduct harmful to prisoners and responded to such knowledge in a way that manifested deliberate indifference to that harm, whatever its degree.

23

an affirmative duty of protection and their employees are absolutely prohibited by the criminal law from engaging in certain conduct.

In addition to explaining why the Gipson Memorandum provided inadequate protection, Cash's expert witness testified that accepted prison practice for deterring sexual misconduct between male guards and female prisoners was to prohibit unmonitored one-on-one interactions. To the extent ECHC policies permitted such interactions, the expert opined that the Allen complaint should have served as a "red light" alerting defendants that "this is not a good policy," and that it was necessary to eliminate the conditions conducive to the prohibited activity. Trial Tr. at 533-34. We have no occasion to consider the possibility of contrary views; defendants offered no such evidence. Thus, we must assume that the jury credited the opinion of Cash's expert and permissibly relied on it in deciding that Gallivan's failure to do more than issue the Gipson Memorandum demonstrated deliberate indifference to the risk of continued and possibly aggravated sexual misconduct posed by unmonitored one-on-one contact between male guards and female prisoners. See Vann v. City of New York, 72 F.3d at 1049 (recognizing that deliberate indifference may be shown "through expert testimony that a practice condoned by the defendant municipality was contrary to the practice of most police departments and was particularly dangerous because it presented an unusually high risk that constitutional rights would be violated" (internal quotation marks omitted)).

We must further assume that the jury drew adverse inferences of deliberate indifference from defendants' token response to the misconduct detailed in the Allen

24

investigation report. Gallivan testified that he could not even recall whether he ever reviewed the Allen investigation report—which was addressed to him—or only relied on a subordinate's account of its contents. See Trial Tr. at 361-62. Nevertheless, rather than follow investigators' recommendation to suspend the offending deputy for thirty days, the Sheriff's Department imposed only three days' suspension, and allowed the deputy to satisfy the punishment by giving up accrued compensatory time. Further, defendants' apparent failure to make any effort to identify, much less discipline, other guards involved in a broader pay-for-exhibitionism practice at ECHC could have supported a jury inference that defendants were not committed to providing the supervision and discipline necessary to enforce the no-contact policy and, thereby, to protect prisoners from sexual exploitation. See Tafoya v. Salazar, 516 F.3d 912, 919 (10th Cir. 2008) (observing that "no-contact" policy is "empty gesture without corresponding supervision and a legitimate threat of discipline for infractions"). Additional support for such an inference might have been found in Gallivan's professed inability on the stand to provide a "yes" or "no" answer to the question whether, as sheriff, he had "a duty to keep safe any inmates that were put into [his] care and custody." Trial Tr. at 320-21 (claiming need first to "review the specific section" of state law). As the jury heard, such a duty is clearly prescribed by New York Correction Law § 500-c(4). See id. at 1013 (instructing jury that "Sheriff Gallivan had a nondelegable duty to keep prisoners in the holding center safe").

In so construing the record, we do not suggest that a reasonable jury could not have viewed this trial evidence more favorably to defendants. Indeed, this case presents a close

25

question as to how to weigh the evidence advanced to establish deliberate indifference. But it is not a question that we think must be resolved as a matter of law—rather than fact—for the defendants. When the evidence is viewed in the light most favorable to Cash and all inferences are drawn in her favor, a reasonable jury was not compelled to find for defendants. See Zellner v. Summerlin, 494 F.3d at 370-71. Rather, the jury reasonably could have found that defendants knew, by virtue of New York state law, that female prisoners in their custody faced a risk of sexual abuse by male guards; that, by 1999, defendants also knew that a policy simply proscribing all sexual contact between male guards and female prisoners was insufficient to deter such conduct at ECHC; and that, in these circumstances, defendants' mere reiteration of the proscriptive policy unaccompanied by any proactive steps to minimize the opportunity for exploitation, as for example by prohibiting unmonitored one-on-one interactions between guards and prisoners, demonstrated deliberate indifference to defendants' affirmative duty to protect prisoners from sexual exploitation. Accordingly, the district court erred in granting defendants judgment as a matter of law.

B.      Defendants Are Not Entitled to a New Trial

Defendants contend that if the judgment in their favor is reversed, the district court's denial of their Rule 59 motion for a new trial should also be reversed. They submit that a new trial is warranted because (1) Question Two on the special verdict form (a) improperly conflated the policy and causation elements of the § 1983 claim, (b) misstated the causation element, and (c) failed to allow the jury to consider whether Deputy Hamilton was the sole cause of Cash's injuries; and (2) the jury's verdicts as to Cash's federal and state claims were

26

inconsistent. Although the district court denied defendants' Rule 59 motion as moot in light of its entry of judgment as a matter of law in their favor, it nevertheless addressed the merits of defendants' claims and concluded that they did not warrant a new trial. We review the denial of a Rule 59 motion for abuse of discretion, see AMW Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 456 (2d Cir. 2009), and we identify none in the district court's merits decision.

## 1. Special Verdict Form

The formulation of special verdict questions rests in the sound discretion of the trial judge, see Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 141 (2d Cir. 2007), and will warrant reversal only if the questions mislead or confuse the jury, or inaccurately frame the issues to be resolved, see Fidelity & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp., 540 F.3d 133, 139 (2d Cir. 2008). In making this assessment, we must read challenged questions "in conjunction with the judge's charge to the jury." Shah v. Pan Am. World Servs., Inc., 148 F.3d 84, 96 (2d Cir. 1998) (internal quotation marks omitted).

To preserve for appeal any objection to the form or substance of questions on a special verdict form, a party must object before the jury has retired to deliberate. See Fed. R. Civ. P. 49(a); Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d at 141; Jarvis v. Ford Motor Co., 283 F.3d 33, 57 (2d Cir. 2002) (noting that failure to object results in waiver). The objection must be made "on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1); see Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d at 141 n.2. Defendants failed to comply with these requirements. Even

if their objections were properly preserved, however, defendants cannot demonstrate abuse of discretion.

### a. Conflating Policy and Causation Elements

Question Two on the special verdict form asked the jury: "Was the violation of [Cash's] constitutional rights proximately caused by a custom, policy, or practice of the County of Erie?"  Defendants contend that they properly objected to this question when counsel stated: "The problem I have with it is this is a combination that combines the liability and the causation in one question."  Trial Tr. at 907.  Counsel's statement, however, must be viewed in context, which was to urge substitution of defendants' own proposed version of Question Two: "Did the County of Erie and Sheriff Patrick Gallivan by virtue of a policy or custom violate[] the plaintiff's constitutional rights?"  Id.  As the district court recognized, the alternative formulation itself implicitly combined the policy and causation elements of Cash's municipal liability claim:  "I think that is essentially what [the court's proposed Question Two] says."  Id.  Defendants never clarified that they sought to have the policy and causation elements of a § 1983 claim put to the jury in two distinct questions.  Certainly, they never presented the district court with proposed separate interrogatories.  See generally Tuttle v. Equifax Check, 190 F.3d 9, 15-16 (2d Cir. 1999) (holding objection to composite verdict form waived where plaintiff "never asked that the district court prepare separate interrogatories for each prong" and "never objected to the charge on this ground").  Accordingly, we conclude that defendants' objection was not stated with sufficient clarity to preserve it for appellate review.

Even if we were to conclude otherwise, defendants cannot show that when Question Two is considered in light of the jury charge there was any confusion as to Cash's burden to prove both policy and causation. The district court made this clear when it identified policy and causation as distinct elements of the § 1983 claim. To satisfy the "second element" of the federal claim, the court instructed that Cash was required to prove that Deputy Hamilton's actions were "the result of an official policy, practice or custom," which could be evidenced by "a failure by policy makers to properly supervise their subordinates amounting to deliberate indifference to the rights of those who came in contact with municipal employees." Trial Tr. at 1009-10. Only after explaining plaintiff's burden to prove the existence of a policy did the court proceed to instruct the jury as to the "third element" of the federal claim, which required Cash to prove that defendants' policy was "a proximate cause of the injuries sustained by the plaintiff." Id. at 1011. Even in the criminal context, we deem it within a trial court's discretion to frame the questions a jury must answer in terms that could be construed to combine elements, as long as the jury is properly instructed as to each fact that must be found. Cf. United States v. Quinones, 511 F.3d 289, 315 (2d Cir. 2007). Because the district court satisfactorily instructed the jury as to the need to find both policy and causation proved, we identify no potential for juror confusion or abuse of discretion in Question Two.[8] Defendants' reliance on Vippolis v. Village of

---

[8] Although defendants below objected only to the special verdict form and not the jury instructions, the district court determined, sua sponte, that its charge constituted "plain error," because "it did not in all instances require that [the jury] find that the policy reflected deliberate indifference to plaintiff's rights by municipal policymakers." Decision & Order, supra, at 6 n.5. Where a litigant has not complied with Federal Rule of Civil Procedure 51 objection requirements, we may review jury instructions only for "fundamental error," which

29

Haverstraw, 768 F.2d 40 (2d Cir. 1985), is inapposite because the concern presented in that case—that the special verdict question "did not in terms require the jury to find causation," id. at 45 n.5—is not present here.

      b.      Reference to "Proximate Cause" Rather than "Moving Force"

Defendants identify error in the district court's use of "proximate cause" rather than "moving force" in Question Two to identify Cash's causation burden. Because they point to nothing in the record indicating that they specifically requested that the district court use

---

is more stringent than the "plain error" standard applicable in criminal appeals. See SEC v. DiBella, 587 F.3d 553, 569 (2d Cir. 2009) (observing that for charging error "to be fundamental, it must be so serious and flagrant that it goes to the very integrity of the trial" (internal quotation marks omitted)). Here, we discern no error, much less fundamental error, because the district court correctly instructed that a finding of deliberate indifference was necessary to establish a municipal policy, practice, or custom based on defendants' failure to act, see Trial Tr. at 1010, which was the theory of liability argued to the jury. In any event, defendants have abandoned this issue by failing to raise it in their cross-appeal urging a new trial. See Universal Church v. Geltzer, 463 F.3d 218, 229 (2d Cir. 2006) ("Generally claims not raised on appeal are deemed abandoned, at least when it is the appellant who fails to do so.").

We note, however, that the district court did err when it instructed the jury that Gallivan must have been subjectively aware of a risk of sexual assault to find deliberate indifference in this context. See Trial Tr. at 1010 (instructing that Gallivan "must have both been aware of the facts from which the inference could be drawn that a substantial risk of serious harm to the plaintiff existed, and also must have drawn such an inference" (emphasis added)). "Deliberate indifference" is defined differently for purposes of proving a prison conditions claim under the Eighth or Fourteenth Amendment in the first instance, and for establishing municipal liability for that violation thereafter. In the former context, deliberate indifference is a subjective standard requiring proof of actual knowledge of risk by the prison official. See, e.g., Caiozzo v. Koreman, 581 F.3d at 70-71. By contrast, for purposes of establishing municipal liability, deliberate indifference is an objective standard that is satisfied if the risk is so obvious that the official should have known of it. See Vann v. City of New York, 72 F.3d at 1049; see generally Farmer v. Brennan, 511 U.S. at 840-42 (explaining "deliberate indifference" standard in these different contexts). Because the jury returned a verdict in favor of Cash on the § 1983 claim notwithstanding the fact that the district court's charge on deliberate indifference held her to a higher subjective standard of proof, any error in this regard was necessarily harmless.

the latter phrase in Question Two, this argument is also waived. In any event, defendants cannot demonstrate abuse of discretion because "proximate cause," although derived from tort law, fairly describes a plaintiff's causation burden with respect to a municipal liability claim under § 1983. See, e.g., Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008) (equating "moving force" with "proximate cause" for purposes of Monell liability); Smith v. District of Columbia, 413 F.3d 86, 102 (D.C. Cir. 2005) (same); see also Oklahoma City v. Tuttle, 471 U.S. 808, 833 n.9 (1985) (Brennan, J., concurring) (recognizing application of "[o]rdinary principles of causation used throughout the law of torts" to Monell claims).

### c. Failure To Ask Whether Hamilton Was Sole Cause of Injury

Defendants' contention that the verdict form was deficient in failing to inquire whether Deputy Hamilton was the sole cause of Cash's injuries merits little discussion. Because defendants cite to nothing in the record indicating that they requested that such an inquiry be made on the special verdict form, the argument is not preserved for appellate review. Even if we reached this claim, however, we would identify no abuse of discretion. Question Two must be considered together with the district court's instruction that the County could not be held liable solely because Hamilton was its employee or without proof that the constitutional violation resulted from a County policy, practice, or custom. See Trial Tr. at 1009. This accurately framed the issue to be decided. Had the jury determined that Hamilton was solely responsible for Cash's injuries, it would have answered Question Two in the negative. Indeed, defendants were free to argue for such a determination in their summation to the jury.

31

Accordingly, nothing about the district court's formulation of Question Two warrants a new trial.

### 2. Inconsistent Verdicts

Citing Federal Rule of Civil Procedure 49(a), defendants submit that the district court erred in failing to order a new trial based on a purported inconsistency in jury verdicts finding defendants liable under § 1983, but absolving Sheriff Gallivan of liability for negligence. See Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 890-91 (2d Cir. 1988) ("[W]hen the answers returned by the jury are inconsistent with one another, it is plain that proper deference to the parties' Seventh Amendment rights to a jury trial precludes entry of a judgment that disregards any material jury finding."). This argument fails for several reasons.

First, the challenge was waived by defendants' failure to raise an inconsistency objection before the district court discharged the jury. See, e.g., Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 83 (2d Cir. 2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury."); see also Denny v. Ford Motor Co., 42 F.3d 106, 111 (2d Cir. 1994) (suggesting case-by-case application of waiver principles to Rule 49(a) challenges). While defendants contend that they preserved this challenge through earlier objections to the verdict form and jury charge, they point to nothing in the record indicating that they timely alerted the district court to the possibility that the verdict form or jury charge might lead to inconsistent verdicts. See Fabri v. United Techs. Int'l, Inc., 387 F.3d 109, 119 (2d Cir. 2004) (holding that when verdict form or jury charge might lead to inconsistent verdicts, "party must object before the

32

jury begins its deliberations"); Jarvis v. Ford Motor Co., 283 F.3d 33, 56-57 (2d Cir. 2002) (same); see also Kosmynka v. Polaris Indus., Inc., 462 F.3d at 85 (noting that timely objection permits court or opposing party to correct error).

Moreover, it is not clear that Rule 49(a) applies here. Although defendants characterize the jury's responses on the verdict form as "special verdicts," and the form is labeled "Special Verdict Form," the questions on the form, viewed in light of jury instructions that specifically identified certain questions as pertaining to the § 1983 claim and others as pertaining to the negligence claim, is reasonably construed to solicit a general verdict with interrogatories on each of Cash's two theories of liability. See Fed. R. Civ. P. 49(b); see generally Jarvis v. Ford Motor Co., 283 F.3d at 56 (Sotomayor, J.) ("[W]here a jury is instructed to apply legal principles and assign liability, 'the answers to the questions submitted to the jury are not special verdicts, despite the use of those words in the title appended to the form, and Rule 49(a) therefore does not apply.'" (quoting Lavoie v. Pac. Press & Shear Co., 975 F.2d 48, 54 (2d Cir. 1992)); see also Mason v. Ford Motor Co., 307 F.3d 1271, 1275 (11th Cir. 2002) ("[C]ourt's instructions to the jury on the law to be applied to the jury's factual findings as well as the requirement that the jury apply the law and render its verdict, belie characterizing this verdict form as a special verdict."). In such circumstances, any inconsistency between general verdicts on Cash's federal and state claims would not necessarily require retrial. See Globus v. Law Research Serv., Inc., 418 F.2d 1276, 1290 n.17 (2d Cir. 1969) ("[C]onsistent jury verdicts are not, in themselves, necessary attributes of a valid judgment [in a civil action]."); U.S. Football League v. Nat'l Football League, 644 F. Supp. 1040, 1045-46 (S.D.N.Y. 1986) (observing that consistent verdicts in

33

separate claims not required), aff'd, 842 F.2d 1335 (2d Cir. 1988); see also Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1035-36 (9th Cir. 2003) (characterizing "majority rule" as permitting legally inconsistent verdicts to stand and citing cases).

In any event, even if the jury's responses were "special verdicts," we identify no irreconcilable inconsistency raising Seventh Amendment concerns. See Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004) (instructing that only where special verdicts are "ineluctably inconsistent" and cannot be "harmonized rationally" does Seventh Amendment require that judgment be vacated and new trial ordered (internal quotation marks and emphasis omitted)); Harris v. Niagara Mohawk Power Corp., 252 F.3d 592, 598 (2d Cir. 2001) (holding that "reviewing court must adopt a view of the case, if there is one, that resolves any seeming inconsistency" (internal quotation marks omitted)). Defendants submit that it was inconsistent for the jury to find, in response to Question Four, that Gallivan was not negligent in providing for Cash's safety at the same time that it found, in response to Question Two, that Gallivan was responsible for a County policy of deliberate indifference to Cash's safety. We disagree. The jury was properly instructed that "[m]ere negligence is not enough" to support Cash's theory of a municipal policy of deliberate indifference, the second element of her § 1983 claim. Trial Tr. at 1010. Thus, as the district court aptly observed, the jury rationally could have concluded that if, as it found, Gallivan was deliberately indifferent, he was not simply negligent. A failure to understand that the higher standard necessarily subsumes the lower may have inured to Gallivan's benefit on the negligence claim, but it did not produce irreconcilably inconsistent verdicts.

34

**III.** **Conclusion**

To summarize, we conclude as follows:

1. Defendants were not entitled to judgment as a matter of law because the evidence was sufficient to support the jury verdict in favor of plaintiff on a municipal liability claim under § 1983. Because defendants owed plaintiff an affirmative duty of care, and because any sexual contact between a guard and a prisoner is absolutely proscribed by New York state law, a reasonable jury could have found that once defendants learned that guards were violating an absolute proscription in any respect, defendants' actions to prevent future violations were so deficient as to manifest deliberate indifference to a risk of the full range of proscribed sexual conduct, including the sexual assault suffered by plaintiff.

2. Defendants are not entitled to a new trial because the errors they assert in Question Two of the special verdict form and the verdict itself were not properly preserved for appellate review. In any event, the verdict form considered together with the jury instructions adequately instructed the jury as to the elements of a municipal policy and causation, and the verdicts holding defendants liable under § 1983 but absolving Sheriff Gallivan for state law negligence were not irreconcilably inconsistent.

Accordingly, the judgment in favor of defendants on the § 1983 claim is REVERSED, and the case is REMANDED with instructions to enter judgment on that claim consistent with the jury verdict in favor of Cash.

DENNIS JACOBS, <u>Chief Judge</u>, dissenting:

I respectfully dissent.

Cash asserts a claim for failure to supervise. The analytical framework for such a claim is set out in <u>Walker v. City of New York</u>, 974 F.2d 293, 297-98 (2d Cir. 1992). Cash concedes that <u>Walker</u> controls, arguing that "the present case meets the three requirements for liability this Court delineated in <u>Walker</u>." Cash Br. at 37. Under <u>Walker</u>, the plaintiff must show: first, a policymaker knew to a "moral certainty" that an employee would confront a given situation; second, the situation presents the employee with a difficult choice *or* there was "a history of employees mishandling the situation"; third, the wrong choice by the employee would frequently "deprive citizens of constitutional rights." <u>Walker</u>, 974 F.2d at 297-98.

Perhaps recognizing that there was no "history of employees mishandling the situation" at the Erie County Holding Center ("ECHC"), the majority sidesteps <u>Walker</u> by framing the issue as "the adequacy of defendants' own actions to prevent sexual contact between guards and prisoners consistent with their affirmative duty to protect prisoners in their custody." Op. at 21. However, that *is* a claim of failure to supervise--one that fails the stringent test set out in <u>Walker</u>.

In finding a basis for a jury verdict adverse to Erie County and the sheriff (whom the jury found was not even negligent), the majority opinion relies on notice that existing measures were insufficient, and the availability of a measure that would be more effective. I disagree on both scores. Taking its holdings together, the opinion can be read (and will be read) to impose strict liability on municipalities and policymakers for any incidents that arise in a prison.

The female plaintiff was raped by a male guard. The jury considered whether the County and the sheriff were deliberately indifferent to the risk that prisoners would be sexually assaulted by guards. But the opinion re-casts the relevant risk in general and expansive terms: the "risk of sexual exploitation posed by male deputies guarding female prisoners."[1] Op. at 19.

Nothing supports even this generalized risk other than the complaint of inmate Allen, three years earlier--a

---

[1] This framing of the risk is incompatible with the concession in the majority opinion that "unmonitored one-on-one interactions between a guard and a prisoner of [a] different sex[] [are] not [themselves] unconstitutional," and with the citation (with approval) of a case that "reject[s] [the] conclusion that every male guard is a risk to the bodily integrity of a female inmate whenever the two are left alone." Op. at 20 (internal quotation marks omitted). No effort is made to resolve this inconsistency.

complaint that was investigated, but that yielded ambiguous

conclusions establishing no more than that the inmate

exhibited herself sexually to guards who did not report her,

and that one or more guards gave her commissary items.  One

guard was found to have violated policy and was given a

three-day suspension without pay.  Thus the Allen complaint

was not ignored: It provoked an investigation; and the

investigation resulted in discipline.  This is not

deliberate indifference to sexual exploitation, and far less

is it deliberate indifference to the risk of rape.  In

faulting the sheriff and County for handling the Allen

complaint in a way that could evidence deliberate

indifference to rape, the opinion elides critical

particulars of that complaint:

> Allen conceded that she knowingly lied when she alleged that: (1) she had sexual intercourse with the guard; (2) a female guard was complicit; (3) she had physical evidence--a condom--that could be linked to the guard.  Joint Appendix at 126-27.

> Allen had a history of threatening guards and making false allegations to "get even" with them for "not getting her what she wanted."  Id. at 115, 120.  She racked up 28 violations of prison rules in the 30 days around the incident.  Id. at 115.

> The investigator found that Allen's allegation was made at least partly out of self-interest: "Ms. Allen stated she had the [condom] and she

3

wanted to know what was 'in it' for her"; and her statement to investigators was in exchange for the potential of a statement by the prison superintendent to the judge on her behalf.  Id. at 118, 128.

She conceded that she seduced the guard: "[H]e didn't force hisself on me or notin'.  An, I totally seduced him.  I mean, I totally went out my way to get him."  Id. at 142.  "Um, when I found out he was interested in me, I made advances at him."  Id. at 130.

That was her standard practice: "I do put on shows for the officers. . . . [I]f I see dey interested . . . dats when I go [i]n for the kill. I be like, 'Oh, you like what you see?' An, I be like, 'Well give me some cigarettes.'"  Id. at 141.

There is no evidence of sexual misconduct by guards at the ECHC prior to Cash's assault besides these questionable allegations from one inmate, three years earlier--at a facility through which 17,000 inmates pass every year, Trial Tr. at 674.

The majority opinion implicitly concedes that the Allen incident may have been insufficient to put the sheriff and the County on notice that Cash might be raped; so the opinion relies as well on evidence that the sheriff was aware of incidents at *other* New York correctional facilities.  Op. at 21.

That is adding nothing to nothing.  If the evidence in this case amounts to sufficient warning of a criminal sexual

4

assault, then a supervisor or government is always on notice of the risk of sexual abuses in prisons, and will always be liable when, sooner or later, something bad happens.  The majority opinion is thus unbounded: It combines an ever-present risk with an inferred "proactive responsibility," Op. at 18, in a way that constitutes strict (and vicarious) liability.  And nothing limits the opinion to conduct by guards, or to sexual conduct.  Did a warden or sheriff, a guard or a County know that sometime in past years one inmate hit another?  Or that a guard observed or tolerated sexual misconduct by an inmate and received insufficient discipline for failing to report it (or for a gift of candy)?  Or that something like that happened someplace else in the state?  If so, they could be held liable as well for every act of prisoner-on-prisoner violence or sexual misconduct (even rape).  To hold a municipality and its policymaker liable in this way eviscerates the Supreme Court's limitations on municipal and policymaker liability.

The measures taken by defendants to prevent sexual exploitation of inmates were stringent: a no-excuses policy that is integral to training, that is enforced by supervision, that is reinforced by threat of discipline in a written notice, and that was implemented by an investigation

5

and discipline following the only relevant inmate grievance in prior years. Yet the majority opinion holds that the jury could find that the defendants knew that the measures taken to protect Cash were insufficient. Op. at 21-22. The majority opinion "must assume" (and I agree) that the only ground on which the jury could have found deliberate indifference is failure to implement a policy (urged by plaintiff's expert witness) that the ECHC should have had a policy altogether preventing "unmonitored one-on-one contact between male guards and female prisoners." Op. at 25. The expert offered as good practice (in the opinion's words) "to pair a female officer with a male officer whenever direct interaction with a female prisoner is required." Op. at 10.

Among the absurdities here is that no guard can know when direct contact may become required; in prison, interventions are not always by appointment. And at the risk of being obvious, this policy would either impose enormous incremental costs or would halve the personnel available for supervision of the facility (and thereby increase the risk of prisoner-on-prisoner violence and abuse).

In any event, the risk associated with having men and women interact in a closed environment is bred in the bone;

6

it means nothing to say that the prison authorities should anticipate it.  Abating that risk is another matter.  If the majority opinion is sound, the only effective solution would be to have no guards of the opposite sex in women's or men's prisons.  The majority opinion does not take account of the considerable ramifications.  Because male inmates greatly outnumber female inmates, the resulting curtailment of opportunity for female guards would likely trigger valid Title VII suits.  People with known same-sex preferences may not be able to serve as guards in any prison.  And in another sphere, since military officers are responsible for their subordinates, we could not have mixing of the sexes in the military, unless (I suppose) the officers are paired off.

                    *     *     *

    Finally, the majority casually discards--in a footnote, without explanation, Op. at 31 n.8--the district court's own conclusion that the jury charge was deficient and that a new trial was warranted.  (The magistrate judge would have <u>sua sponte</u> ordered a new trial had he not awarded judgment as a matter of law to the County and the sheriff.  <u>See</u> Decision & Order, <u>Cash v. Cnty. of Erie</u>, No. 04 Civ. 182, at 6 n.5 (W.D.N.Y. Mar. 10, 2009).)

7