*Lucente v. County of Suffolk*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2019

(Argued: January 6, 2020     Decided: November 17, 2020)

No. 19-347

_____

TARA LUCENTE, JANET VIOLA, JAMIE A. CULOSO,

*Plaintiffs-Appellants*,

SHARON WATTS, MICHELE ATKINSON, CATHERINE ANDES,

*Plaintiffs*,

— v. —

THE COUNTY OF SUFFOLK, SUFFOLK COUNTY SHERIFF'S DEPARTMENT, OFFICER JOSEPH FOTI, EACH BEING SUED INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY, OFFICER JOHN SANTACROCE, EACH BEING SUED INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY, AKA OFFICER SANTA CRUZ,[1]

*Defendants-Appellees*.

_____

Before:          KEARSE, CARNEY, and BIANCO, *Circuit Judges*.

Plaintiffs Tara Lucente, Jamie A. Culoso, and Janet Viola appeal from a judgment of the United States District Court for the Eastern District of New York (Donnelly, *J.*), dismissing their claims against defendants County of Suffolk and the Suffolk County Sheriff's Department, as well as Sergeant Joseph Foti and

---

[1] The Clerk of Court is respectfully instructed to amend the caption as set forth above.

Corrections Officer John Santacroce, in connection with Foti's alleged sexual harassment and sexual assault of female inmates at the Suffolk County Correctional Facility in Riverhead, New York, in violation of 42 U.S.C. § 1983. The district court granted summary judgment on plaintiffs' claims on the grounds that: (1) there was insufficient evidence in the record of a municipal policy or custom to trigger liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); (2) the claims brought by Lucente and Culoso were barred by the statute of limitations under § 1983; and (3) Viola failed to exhaust her administrative remedies with respect to her claims as required under the Prison Litigation Reform Act. For the reasons that follow, we **AFFIRM** the district court's grant of summary judgment as to Viola's claims, but **VACATE** as to the dismissal of Lucente and Culoso's claims against Suffolk County and the individual defendants, and **REMAND** to the district court for proceedings consistent with this opinion.

LUIS C. HANSEN (Darnley D. Stewart, *on the brief*), Outten & Golden LLP, New York, NY; Laura A. Solinger, Law Offices of Laura A. Solinger, Esq., Southold, NY (*on the brief*), *for Plaintiffs-Appellants*.

BRIAN C. MITCHELL (Arlene S. Zwilling, *on the brief*), Assistant County Attorneys, *for* Dennis M. Cohen, Suffolk County Attorney, Hauppauge, NY, *for Defendants-Appellees County of Suffolk, Suffolk County Sheriff's Department, and Officer John Santacroce*.

WILLIAM P. NOLAN, Esq. Garden City, NY, *for Defendant-Appellee Officer Joseph Foti*.

_____

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiffs Tara Lucente, Jamie A. Culoso, and Janet Viola (collectively, "plaintiffs") appeal from a judgment of the United States District Court for the Eastern District of New York (Donnelly, *J.*), dismissing their claims against defendants County of Suffolk and the Suffolk County Sheriff's Department (together, "Suffolk County"), as well as Sergeant Joseph Foti and Corrections Officer John Santacroce (collectively, "defendants"), in connection with Foti's alleged sexual harassment and sexual assault of female inmates at the Suffolk County Correctional Facility in Riverhead, New York (the "Riverhead Facility"), in violation of 42 U.S.C. § 1983. The district court granted summary judgment on the plaintiffs' claims on the grounds that: (1) there was insufficient evidence in the record of a municipal policy or custom to trigger liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978); (2) the claims brought by Lucente and Culoso were barred by the statute of limitations under § 1983; and (3) Viola failed to exhaust her administrative remedies as required under the Prison Litigation Reform Act ("PLRA") with respect to her claims.

On appeal, plaintiffs contend that, with respect to the municipal liability claim, the district court overlooked evidence in the record that precluded summary judgment on whether Suffolk County had both actual and constructive

3

knowledge of Foti's persistent and widespread sexual misconduct involving female inmates, but failed to adequately remedy it. Lucente and Culoso further argue that their claims were timely under the continuing violation doctrine. Finally, Viola submits that the PLRA exhaustion requirement should have been excused on the theory that a campaign of threats and retaliation against female inmates at the Riverhead Facility, as well as Foti's sexual intimidation of her, made the administrative process unavailable to her.

For the reasons that follow, we AFFIRM the district court's grant of summary judgment as to Viola's claims, but VACATE as to the dismissal of Lucente and Culoso's claims against Suffolk County and individual defendants, and REMAND the case to the district court for proceedings consistent with this opinion.

## I.    BACKGROUND

Lucente, Culoso, and Viola, as well as three other former plaintiffs (Sharon Watts, Michele Atkinson, and Catherine Andes) who settled their claims with defendants, were all pre-trial inmates at the Riverhead Facility from May 2009 to April 2011. These women alleged that they were subjected to sexual assault, sexual harassment, and sexually degrading treatment by Foti during their time at the

4

Riverhead Facility, and that Suffolk County and Santacroce were aware of Foti's misconduct but failed to halt it.

At the conclusion of discovery, in response to defendants' summary judgment motion, plaintiffs presented various categories of evidence to the district court to support their claims, including the Internal Affairs Section of the County Sheriff's Office ("Internal Affairs") investigation reports in the 1990s regarding allegations of sexual harassment and sexual assault against Foti, observations of various corrections officers regarding Foti's inappropriate conduct with female inmates, harrowing sworn accounts from plaintiffs themselves and other inmates about sexual harassment and sexual assault perpetrated by Foti, and some inmates' subsequent attempts to report his behavior to officials at the Riverhead Facility. Although this evidence was disputed, the district court, in the context of a summary judgment motion, must view such evidence in the light most favorable to plaintiffs and draw all reasonable inferences in their favor. *See Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010). With that legal principle in mind, plaintiffs' evidence in support of their claims is summarized below.

**A.     The Riverhead Facility**

The organizational hierarchy at the Riverhead Facility was well established during the time period at issue.  Foti was a corrections officer assigned to the Riverhead Facility's Rehabilitation Unit (the "Rehab Unit").  Foti reported to Sergeant Noreen Fisher, who reported to Lieutenant Darlene McClurkin.  Fisher served as the "sexual harassment officer" at the Riverhead Facility.  Sealed Appendix ("Sealed App'x") at 90.[2]  McClurkin reported to a Captain Johnson.  McClurkin usually reported issues to the Warden through the chain of command.  Separately, Internal Affairs received investigation reports regarding allegations made by inmates and others of sexual misconduct.  In addition, Santacroce was an investigator in the Security Unit of the Riverhead Facility.  In this role, Santacroce and the other security investigators were "in charge of the safety and security of the facility" which included "movements of inmates."  *Id.* at 37.  Santacroce testified that the female inmates could go to "anybody" at the Riverhead Facility with complaints of inappropriate conduct. *Id.* at 40.

Much of the Riverhead Facility's inmate programming ran through the Rehab Unit, where Foti was assigned.  Inmates at the Riverhead Facility attended

---

[2] Portions of the appendix have been filed under seal and are hereby deemed unsealed to the extent that their content is quoted or described in this opinion.

church services, Alcoholics Anonymous, and Narcotics Anonymous meetings in the chapel in the Rehab Unit. The Rehab Unit also housed the Riverhead Facility's law library and classrooms. At the time of plaintiffs' incarceration, there were no cameras at the Riverhead Facility except in the visiting room.

## B. The Early Investigations of Foti's Misconduct

Foti began working at the Riverhead Facility as a corrections officer in January 1988. In the 1990s, Foti was the subject of several Internal Affairs investigations, including allegations of sexually inappropriate behavior and other misconduct that could constitute such behavior, and the results of those investigations were documented. In 1992, an Internal Affairs investigation found that Foti engaged in misconduct when, on two occasions, he failed to enter a female inmate's movement into the logbook after he removed her from her housing unit for the alleged purpose of cleaning the cellblock. According to Foti, he was accused of "do[ing] inappropriate things" with the inmate. *Id.* at 87. As a result, Foti was reprimanded and cautioned that repetition of this behavior would result in more serious disciplinary action. In 1994, Internal Affairs opened another investigation into Foti regarding an allegation of fraternizing with an inmate. Internal Affairs closed this investigation in 1995, and issued Foti a letter of

warning. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ █████████ In 1997 and 1998, Internal Affairs

opened still more investigations into Foti regarding allegations of harassment by

Foti in his personal life. The subsequent 1997 investigation involved an allegation

by his ex-girlfriend that Foti sexually harassed her; it too was marked closed

"pending further information." *Id.* at 87, 238. The 1998 investigation related to

allegations of harassment by Foti's ex-fiancée that he harassed her from April 1996

to August 1996, and was marked as "closed/unsubstantiated." *Id.* at 87, 235. These

Internal Affairs investigation reports were maintained by Suffolk County in an

electronic database that reflects the date that each complaint was sent to the

County Sheriff and the nature of the complaint.

## C. The Reputation and Supervision of Foti

Plaintiffs adduced evidence that Foti had a reputation among his fellow

employees for inappropriate behavior with female inmates at the Riverhead

Facility. Corrections Officer Catherine Laton observed that Foti was "overly

---

[3] ██████████████████████████████████████████████████████
████████████████████████████

friendly" with female inmates and he crossed "the line" in his behavior toward the women. Redacted Appendix ("Redacted App'x") at 223-24, 228. Laton called Foti "an accident waiting to happen" with regard to his inappropriate behavior with female inmates. *Id.* at 224. Laton observed that Foti would bring female inmates to the law library out of rotation. On one occasion, Laton observed Foti caress a female inmate's arm during a mass service in the chapel. Laton reported her concerns about Foti's conduct to her supervisor, Fisher, who was the sexual harassment officer at the Riverhead Facility, as well as to McClurkin, who was a lieutenant and the head of the Rehab Unit where Foti worked. After Laton shared her concerns about Foti to Fisher and McClurkin, both agreed to speak to him. However, Foti testified that no one ever spoke to him about his alleged inappropriate behavior.

Fisher testified at her deposition that she was aware of complaints and concerns expressed by female inmates of inappropriate comments and behavior toward them by Foti. At some point prior to September 2011, an inmate reported that she believed Foti was having "inappropriate relations" with two female inmates. Sealed App'x at 94-95. Specifically, although the inmate had not observed any misconduct, she believed that Foti was bringing "breakfast specials"

9

("egg sandwiches and coffee") to female inmates and "they were doing special favors for him." *Id*. at 95. Another inmate told Fisher that Foti was "too touchy feely" with the female inmates, that he was a "pig," and that she did not want to work in an area with him. *Id.* at 99. On a separate occasion, another corrections officer reported to Fisher that she observed Foti massaging a female inmate. Fisher further stated that Laton told her that Foti was being "overly friendly" with the female inmates. *Id.* at 105. Fisher also testified that she led a weekly women's group where the female inmates could discuss various personal matters. At one of the meetings, an inmate told her that Foti would share his sexual preferences and experiences with women, including experiences with his wife. *Id.* at 100. Fisher acknowledged that it was not "a good idea" to discuss these topics in front of inmates but did not address it with Foti. *Id.* at 106. In addition, Fisher recalled that Foti would often receive phone calls from released female inmates because "he would be teased about it." *Id*. at 103. Fisher explained that Foti's supervisors "had to correct [his behavior] so many times it was like being a mother . . . you would be frustrated sometimes and just say, okay, you gotta stop." *Id.* at 106.

According to Fisher, she reported some of these complaints and concerns regarding Foti to her supervisor, McClurkin. For example, Fisher testified that she

10

reported to McClurkin the inmate's suspicion that Foti was having inappropriate relations with two female inmates. In response, McClurkin called Foti into her office to discuss the allegations of the inappropriate behavior, but Foti completely denied those allegations.[4] Fisher also reported to McClurkin that Foti would call female inmates out of rotation to the law library and not follow the schedule. McClurkin and Fisher told Foti he could no longer bring female inmates to the library out of schedule. Foti said that was "ridiculous" and that he "could decide when and who he wants to bring down." *Id.* at 96. Fisher further described to McClurkin that Foti visited the female inmates' tiers to notarize documents, rather than following the standard procedure of notarizing documents in the law library. Finally, Fisher stated that she and McClurkin confronted Foti about giving an inmate a massage, that Foti admitted to doing so, and that McClurkin "yelled at him, took him into the office and told him to knock it off." *Id*. at 104.

### D. Foti's Sexual Harassment and Sexual Assault of Plaintiffs

All six of the original plaintiffs in this case testified in detail at their depositions about Foti's sexual harassment and sexual assaults of them while they

---

[4] There is no testimony from Foti confirming that this discussion with McClurkin occurred; rather, as noted above, Foti testified that none of his supervisors ever spoke to him about inappropriate behavior with inmates.

11

were incarcerated at the Riverhead Facility. When combined, the incidents they testified to spanned from May 2009 to April 2011.

*Lucente* was incarcerated at the Riverhead Facility from May 10, 2009 until July 12, 2010. According to Lucente, in June 2009, Foti sexually assaulted Lucente after removing her and another inmate from a line to the women's restroom during a religious retreat at the Riverhead Facility. Foti pushed Lucente against the wall, grabbed her by the throat, and licked her all over her body, including her face and chest. Foti then pulled Lucente's pants down and touched her vagina, while Lucente tried to escape from him. The other inmate heard Lucente scream for Foti to stop. Foti told the other inmate to leave, but she refused. Eventually, Foti retreated and told Lucente to wash her face because she had been crying and to "keep [her] f***ing mouth shut" about what happened. Redacted App'x at 241-42. After the sexual assault, Foti continued to sexually harass Lucente whenever he saw her. Foti would growl at her and rub his body into her when she passed by. According to Lucente, "this was his thing all the time," so she stopped going to the chapel. *Id*. at 235.

Lucente shared with some of the other female inmates that Foti sexually assaulted her. Later, Santacroce called Lucente down to meet with her, but

12

Santacroce ignored Lucente's complaint that Foti attacked her at the religious retreat, and Santacroce ordered her back to her housing unit. As a result of her complaint about Foti to Santacroce, Lucente was moved to the maximum security unit on the fifth floor of the Riverhead Facility where she was placed on twenty-three hour lockdown. Lucente eventually returned to the Rehab Unit and, on several occasions when she saw Foti, he would grab his crotch, wag his tongue, and growl at her. She again explained that, as female inmates passed him by, Foti would block them so he could forcibly touch them on their arms, back, or anywhere he could reach. She characterized Foti's inappropriate behavior in this regard as "relentless." *Id*. at 248.

*Viola* was incarcerated at the Riverhead Facility from January 13, 2010 to May 2010. About a month into her incarceration, Viola asked Foti if she could use the telephone in the chapel of the Riverhead Facility. While she was on the phone with her mother, Foti grabbed Viola's hand to rub his crotch. On another occasion, because she was terrified for her own safety after a fellow inmate was brutally beaten by two corrections officers in March 2010, Viola asked Foti to use the telephone again to ask her family to bail her out as soon as possible. During this

call, Foti pulled his penis out of his pants and forced her to give him a "hand job" while she was on the phone. Sealed App'x at 128.

*Culoso* was incarcerated at the Riverhead Facility from August 2009 until December 2010. As with other inmates, Foti permitted Culoso to use the telephone on multiple occasions during which he would make sexual gestures, claw at her, and grunt. Culoso also testified about a sexual assault that occurred in the law library. As she entered the law library, Foti was sitting at a desk with the computer opened to Culoso's Facebook page. As Foti looked at her Facebook page, he asked her if she was wearing a bra in one of the photographs. Culoso said Foti told her that she was getting him "so aroused." *Id.* at 184-85. Culoso tried to leave, and Foti grabbed her by the wrist and rubbed his crotch against her. Culoso's mother called the Riverhead Facility to complain about Foti's behavior. A couple of days later, an unidentified lieutenant visited Culoso in her housing unit and, after she recounted what Foti had done to her, advised her not to pursue a grievance against Foti.

*The other plaintiffs* in this lawsuit (Watts, Andes, and Atkinson) also testified to being sexually harassed and sexually assaulted by Foti, as well as experiencing indifference and/or retaliation from Riverhead Facility personnel when they

complained about his conduct, including complaints to Santacroce. Watts observed Foti flirt with female inmates and touch them inappropriately. Watts said that Foti would regularly and openly touch himself in front of the inmates when they were in the Rehab Unit. In July or August of 2009, Foti sexually assaulted Watts when she asked to use the telephone in the chapel to call her family. Like Viola, as Watts sat at the desk and used the telephone, Foti unzipped his pants and forced her to rub his penis. A couple of days later, Watts reported Foti's conduct to Santacroce who laughed in response and told her to "suck it up, it's jail." *Id.* at 11. After speaking to Santacroce about Foti, Watts, like Lucente, was moved to maximum security on the fifth floor of the Riverhead Facility and placed on twenty-one-hour lockdown. Watts pleaded with Santacroce to move her from maximum security but he said not until she "learned how to behave." *Id.* at 23. Once Watts promised to "keep [her] mouth shut," Santacroce moved her back to her regular unit. *Id.* Several months later, in the winter of 2009 to 2010, Foti assaulted Watts again when she was using the telephone in the chapel. This time, Foti forced Watts to put her hand around his penis and ejaculated on her face. After he ejaculated, Foti continued to rub his penis on her face. On a later occasion, Foti approached Watts as she was making photocopies in the law library

and "dry hump[ed]" her from behind. *Id.* at 171. Subsequently, Foti was in Watts's housing unit to notarize documents for female inmates. Watts waited in line and, when it was her turn, Foti leaned into her and made an inappropriate sexual comment to her. In the spring of 2010, Foti again assaulted Watts when she was calling her family to discuss her sentencing. This time, Foti pulled his penis out of his pants and asked that Watts give him a "blow job." *Id.* at 169. Foti forced Watts to hold his erect penis while she spoke on the phone to her family.

*Andes* was incarcerated at the Riverhead Facility between February 2010 and April 2011. On several occasions, Foti commented that Andes was beautiful and made inappropriate sexual comments to her. One evening in May or June 2010, when Andes attended a meeting in the chapel, Foti called her into another room. The two began talking and, at one point, Foti grabbed Andes's hand and forced her to put it on his crotch. Foti then pulled Andes into his body and tried to kiss her, but another inmate, Atkinson, walked in. Atkinson asked what was going on, and Foti responded by grabbing Atkinson's chest and asking if she wanted to join him and Andes. Atkinson smacked Foti's hand away, and she and Andes left the room. About a month or two after the incident, Andes approached Santacroce about Foti's conduct, but he "shut [her] down before [she] could even say

16

anything." Redacted App'x at 151. Santacroce said that, unless Andes was in his office to report information about drugs at the Riverhead Facility, he did not want to hear her complaint.

*Atkinson* was incarcerated at the Riverhead Facility between December 2009 and August 2010. Foti sexually assaulted Atkinson on an elevator shortly after she arrived at the Riverhead Facility. On that occasion, Foti was escorting Atkinson to the medical unit and, once the two were alone in the elevator, Foti pushed Atkinson, grabbed her hand, and put it on his exposed penis. Additionally, Foti made numerous sexually harassing comments to Atkinson and, on several occasions, touched his crotch in front of her while she attended meetings in the chapel. After the elevator incident, Foti again exposed himself to Atkinson in the law library approximately three or four times. According to Atkinson, she filed a formal grievance about Foti that, as she recalled, reported "the incident that [she] had with [Foti] in the elevator and [that she] need[ed] to speak to somebody immediately, that [she] was scared for [her]self and the other women in the facility." Sealed App'x at 208-09. She submitted a written grievance to a corrections officer, and she saw him hand it to a sergeant. Atkinson also tried to report Foti's sexual misconduct to Santacroce, who similarly told her, "[i]f you

know what's best for you, you will keep your f***ing mouth shut." *Id.* at 210, 212-13. According to Atkinson, after her conversation with Santacroce about Foti, she was subjected to retaliation. Specifically, the next time a family member visited, Atkinson and her visitor were searched, and from then on, she was only permitted box visits, a more restrictive visitation where no physical contact is allowed between the inmate and visitor.

### E.     The 2011 to 2013 Internal Affairs Investigation and Report

Santacroce testified that, in September 2011, three or four different inmates reported to him that Foti behaved in a sexually inappropriate manner with female inmates. Santacroce reported the complaints to his supervisor, Sergeant Lundquist. Internal Affairs was then notified about the allegations of sexual harassment and sexual assault by Foti. Internal Affairs then took 18 months, from September 2011 to January 2013, to investigate the allegations of Foti's misconduct and to issue its report.

Based upon this investigation and the resulting 26-page report, Foti was found to have violated the Operations and Procedures Guide for Immoral Conduct and Conduct Detrimental to the Sheriff's Office. Specifically, the investigation included interviews of Watts, Andes, and Culoso, during which they

18

described Foti's sexual harassment and sexual assaults.[5]  The report also included that Watts sent a letter to a District Attorney's office chronicling how Foti had sexually assaulted her.  For example, the report notes that Watts stated in the letter that Foti "unzipped his pants and pulled out his penis" and grabbed her right hand and "pressed it against his penis."  *Id.* at 134.  Watts reported that this sexual assault happened on more than one occasion.  Watts said in her interview that, whenever she made a phone call in the Rehab Unit where Foti was posted, he said to her you "know[] the drill" and would insist she hold his penis while she made a call.  *Id.* at 136.  Andes told investigators that, in one instance, Foti put her hand on his penis outside of his pants, placed his hand on her vagina, and leaned in to kiss her.  Culoso likewise shared with investigators that, when she was in the law library, Foti grabbed her around the waist and pulled her into his crotch area.  Culoso explained that Foti was always "touchy feely" and made "several flirtatious" remarks to her.  *Id.* at 141.  Foti also told Culoso that, if she wanted to make a phone call, he "want[ed] something too."  *Id.*

The Internal Affairs report also detailed that Foti met a former inmate after she was released from incarceration and had sex with her in exchange for money

___

[5] Viola, Lucente, and Atkinson were not interviewed by Internal Affairs as part of this investigation.

in 2006. That former inmate also stated that, while she was incarcerated at the Riverhead Facility, she had seen Foti "touching himself while seated at his desk and [that] he would point out his erection to her." *Id.* at 133. Another inmate referenced in the report said Foti was "very suggestive to the female inmates" and that he made them "uncomfortable." *Id*. That same inmate told investigators that Foti would look up female inmates' information on the computer to see their release date and then offer to drive them home. The Alcoholics Anonymous counselor explained to investigators that Foti would remove female inmates during meetings and that she felt like "something was going on" and that these inmates were "getting favors for something." *Id*. at 138. Laton and Fisher reported to investigators that Foti was sexually inappropriate with female inmates and had once walked into a room where female inmates were changing even after Laton told him to stay out. The report uncovered allegations of persistent and egregious sexual misconduct by Foti; the instances listed above are by no means exhaustive of what is included in the report but highlight only representative accounts of his behavior.

As part of the investigation, Internal Affairs inventoried the contents of Foti's work locker and found pornography, printouts of female inmates' criminal

records, and inmates' email addresses, as well as printouts of former female inmates' social media pages, and a CD containing naked photos of individuals unrelated to the jail.

Based upon this investigation, the January 2013 Internal Affairs report found, *inter alia*, that: (1) Foti "violate[d] the Operations and Procedures Guide Section 103-76 Immoral Conduct for being in possession of pornographic images as well as erotic literature recovered from his locker"; and (2) Foti "violate[d] the Operations and Procedures Guide Section 103-102 Conduct Detrimental to the Sheriff[']s Office for his actions outlined in this case file." *Id*. at 147. The latter finding also related to the items found in Foti's locker. The report noted the inability to corroborate the inmate allegations of sexual misconduct with documentary evidence within the Riverhead Facility, and Foti was not charged with any violations beyond those related to the contents of his locker.

In January 2013, Foti retired after 25 years and received his pension benefits. Foti testified that his retirement had nothing to do with the Internal Affairs investigation, and that none of his supervisors ever spoke to him about any inappropriate behavior toward female inmates. Internal Affairs closed the investigation once Foti announced his retirement in late 2012. On December 5,

21

2012, the Sheriff wrote a letter to Foti to accept his retirement effective January 3, 2013. In the same letter, the Sheriff thanked Foti for his "dedicated services for the past twenty-five (25) years" and noted that Foti's "professionalism and competence have certainly been assets to [the Sheriff's] Office." *Id*. at 217.

## II.  PROCEDURAL HISTORY

On March 28, 2013, five female inmates from the Riverhead Facility – Watts, Lucente, Atkinson, Culoso, and Andes – filed a complaint in the Eastern District of New York against Suffolk County, Foti, and Santacroce for violations of 42 U.S.C. § 1983, alleging that Foti subjected them to sexual assault, sexual harassment, and sexually degrading treatment, and that the other defendants failed to act in response to Foti's known conduct. The Complaint asserted claims for (1) violations of their due process rights under the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution; (2) cruel and unusual punishment in violation of the Eighth Amendment; and (3) violations of their Equal Protection rights under the Fourteenth Amendment. On January 19, 2017,

22

the First Amended Complaint was filed, which added Viola as a plaintiff with respect to those claims.

On August 22, 2017, following discovery, the district court granted Suffolk County's motion for summary judgment in part and denied it in part. The district court granted the motion on municipal liability and dismissed the claims against the County of Suffolk and the Suffolk County Sheriff's Department. The district court, although noting that "there is a question of fact as to whether plaintiffs told [Santacroce] that Foti sexually assaulted them," stated that plaintiffs did not "adduce[] any evidence that McClurkin or Fisher knew about the sexual assaults." *Id*. at 248 & n.11. The district court further concluded that testimony that Foti was an "accident waiting to happen" was unavailing because it was an "expression of potential" and "not a statement that something actually happened." *Id*. at 248. The district court cited certain testimony from female inmates about Foti's conduct, namely that he had "inappropriate relations" with two female inmates, that he shared his sexual preferences and experiences with women, including experiences with his wife, with inmates, and that he was seen "massaging an inmate and walking in while inmates were undressing." *Id*. at 248-49. The district court characterized this behavior as "surely disturbing" but concluded that it

23

"d[id] not establish that Fisher knew that Foti committed sexual assault." *Id.* at 249. The district court further stated that even if McClurkin, Fisher, and Santacroce were aware that Foti sexually harassed and sexually assaulted female inmates, inaction by a few subordinate employees who lacked policymaking authority was insufficient as a matter of law to create municipal liability. *Id.* (citing *Rubio v. County of Suffolk*, No. 01-cv-1806, 2007 WL 2993833, at *4 (E.D.N.Y. Oct. 9, 2007), *aff'd*, 328 F. App'x 36 (2d Cir. 2009)). In reaching this conclusion, the district court explained that Fisher and Santacroce were not "anything other than line officers," and plaintiffs had presented no evidence that they made binding policy or that someone with such policymaking authority had delegated such authority to them. *Id.* The district court also noted that, although McClurkin was of higher rank than Fisher and Santacroce, plaintiffs did not contend that she had policymaking authority either. Accordingly, the district court granted Suffolk County's motion for summary judgment as to the municipal liability claim.

Next, the district court dismissed the claims brought by Lucente and Culoso (including the claims against Foti and Santacroce individually) on statute of limitation grounds. The district court reasoned that, because neither Lucente nor Culoso had alleged that Foti sexually assaulted them within three years of the

24

filing of the complaint, their claims were time-barred. The district court rejected plaintiffs' argument that the continuing violation doctrine should extend the limitations period for all of plaintiffs' claims. Specifically, the district court explained that, because plaintiffs failed to establish a municipal policy to ignore Foti's misconduct, the continuing violation doctrine did not apply.

The district court also dismissed the claims brought by Viola because she failed to exhaust her administrative remedies as required by the PLRA. The district court pointed out that Viola had not alleged "more than a generalized fear of retaliation" and she did not "claim that she was threatened or warned about filing a grievance." *Id*. at 254. The district court further concluded that, because Viola did not demonstrate a connection between the beating of another inmate and her inability to report a grievance, "the grievance procedure was available to her, and her failure to exhaust the administrative remedies is not excused." *Id*.

Following the summary judgment decision, the remaining claims brought by Watts, Atkinson, and Andes against Foti and Santacroce were scheduled to

proceed to trial. However, those parties settled before trial and their claims were voluntarily dismissed.

Plaintiffs moved for reconsideration of the August 22, 2017 decision. On November 2, 2017, the district court denied the motion for reconsideration. Plaintiffs timely appealed both the August 22, 2017 decision dismissing their claims, and the November 2, 2017 decision denying their motion for reconsideration.

## III.    DISCUSSION

### A.    Standard of Review

We review a district court's grant of summary judgment *de novo*. *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008). A motion for summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine issue" exists and summary judgment is therefore improper "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). In reviewing a district court's grant of summary judgment, we must "construe the facts in the light most favorable to the non-moving party and must resolve all

26

ambiguities and draw all reasonable inferences against the movant." *Id.* Summary judgment dismissing a claim "is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (internal quotation marks omitted).

## B. Municipal Liability[6]

Plaintiffs principally argue that the district court's decision to grant summary judgment on the *Monell* claim against Suffolk County was based upon the following errors regarding the factual record and the applicable law: (1) characterizing Foti's conduct as the "*isolated* action of a rogue [] officer," Sealed App'x at 249 (emphasis added); (2) excluding from consideration formal complaints regarding allegations of Foti's misconduct that were sent to the Sheriff in the 1990s; (3) finding that plaintiffs did not show that a policymaker or designated policymaker had knowledge of Foti's sexual misconduct; and (4) limiting the analysis to knowledge by supervisors of allegations of sexual *assaults* by Foti, rather than also more broadly considering knowledge of allegations of

---

[6] Both the parties and the district court construed the municipal liability claim against the Suffolk County Sheriff's Department, which is an administrative arm of Suffolk County, as being against Suffolk County (which also was separately named as a defendant), and we do so on appeal.

27

sexual harassment and other misconduct by Foti towards female inmates. Appellants' Br. at 33-37, 38-39, 41.

We agree. As set forth below, construing the evidence in the light most favorable to plaintiffs, summary judgment on the *Monell* claim was unwarranted because there was sufficient evidence in the record to create a material issue of disputed fact as to whether supervisory officials at the Riverhead Facility consistently ignored Foti's widespread pattern of sexual assaults and sexual harassment of female inmates, such that it constructively supported the inference that policymakers, at the very least, had a custom or practice of acquiescing to Foti's sexual misconduct.

"To hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and alterations omitted); *see Monell*, 436 U.S. at 690-91. "[A] municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), but rather the plaintiff must "demonstrate that, through its deliberate

conduct, the municipality was the moving force behind the alleged injury," *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted).

Under *Monell*, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Such a policy "may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). A municipality's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [municipality] itself to violate the Constitution.'" *Connick*, 563 U.S. at 61-62 (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring in part and dissenting in part)).

In order to establish *Monell* liability based upon a "persistent and widespread" practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); *Krulik v. Bd. of Educ. of the City of N.Y.*,

781 F.2d 15, 23 (2d Cir. 1986)).  In other words, there must be "sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse."  *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012); *see also Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (acknowledging that inaction may lead to municipal liability for the "persistent failure to discipline subordinates who violate civil rights" as it can "give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*").  It is only at that point that, although not expressly authorized, the unconstitutional conduct is so persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware.  *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997).

Within this well-settled legal framework, we proceed to analyze the record evidence in this case in the light most favorable to plaintiffs.

### 1. Severity and Scope of the Alleged Unconstitutional Conduct

First, in assessing whether it can be inferred that municipal policymakers acquiesced in unconstitutional conduct of a subordinate employee, it is important to analyze the severity and scope of the unconstitutional conduct by the employee

or multiple employees. *See, e.g.*, *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014) (noting, in assessing municipal liability, that "the acts of discrimination and harassment alleged by [the plaintiff] were frequent and severe"). Here, the district court characterized Foti's conduct as the "isolated action of a rogue [] officer." Sealed App'x at 249. Although there was no evidence that officers other than Foti participated in the alleged sexual assaults and sexual harassment of female inmates, there was nothing "isolated" about his alleged misconduct at the Riverhead Facility. Putting aside the allegations from the 1990s contained in the Internal Affairs investigations and corresponding reports, the record includes testimony from six different female inmates – namely, the original plaintiffs in this case – who accused Foti of sexually assaulting and sexually harassing them at the Riverhead Facility. In addition to the alleged sexual assaults and sexual harassment of these six inmates over a period of approximately 18 months, the record is replete with evidence of inappropriate touching and/or other sexual harassment of female inmates on a regular basis by Foti in or around that same timeframe. For example, Watts testified that Foti would visit the female tiers and flirt with the inmates and touch them inappropriately, and would regularly touch himself in front of the female inmates when they were in the Rehab Unit.

31

Similarly, Lucente explained that, as female inmates passed by Foti in the Rehab Unit, he would block them so he could forcibly touch them on their arms, back, or anywhere he could reach. She characterized Foti's inappropriate behavior in this regard as "relentless." Redacted App'x at 248. Thus, this evidence and other similar information in the record suggests that Foti's sexual harassment was open and notorious.

There were also statements by Laton of inappropriate behavior which the district court failed to view in the light most favorable to plaintiffs. In considering Laton's testimony regarding Foti as an "accident waiting to happen" and being "overly friendly," the district court dismissed this commentary as an "expression of potential" and not a statement about what actually happened. Sealed App'x at 248. This is too narrow of a view given Laton's overall description of Foti's "overly friendly" behavior crossing the line. Redacted App'x at 223-24, 228; *see also id.* at 228 ("I didn't feel comfortable working with him because of his – I felt he crossed the line with him being too friendly with the female inmates."). In particular, Laton gave an example of Foti's harassing behavior – caressing a female inmate's arm during a mass service. Moreover, in her written statement, Laton described an incident in September 2011 in which Foti walked into an area where female

inmates were undressing, even after Laton told Foti that the inmates were changing in that area.

There was also testimony about Foti's unusual practices within the jail that would allow a jury to rationally infer, in light of the entire record, that Foti created opportunities to regularly engage in inappropriate behavior towards female inmates. For example, Laton stated that she observed Foti bring the same female inmates to the law library more often than was required, and that he would go to the female housing area to notarize documents even though no other officer did that. Fisher similarly testified that "Foti would call down the females out of turn and not follow the schedule," and "would go up to the female floors and do [notarizations] instead of having [the inmates] come down to the law library." Sealed App'x at 96. Watts testified that Foti used his notary visits to the female housing area and the law library (where they were not allowed to sign in) to sexually harass the female inmates. In particular, the allegations that Foti's most egregious conduct often took place in the law library would corroborate the accounts of multiple female inmates (including plaintiffs) of a pattern of sexual harassment and sexual assaults of female inmates by Foti.

In short, construing the evidence in the record most favorably to plaintiffs, a rational jury could conclude that Foti's sexual misconduct against the female inmates (including sexual assaults, verbal harassment, and other inappropriate behavior) was not isolated, but rather was severe, persistent, and pervasive conduct that was executed in a manner that would have been difficult to conceal from supervisory personnel at the Riverhead Facility, including policymakers. *See Matusick*, 757 F.3d at 63 ("[B]ased on the pervasiveness of the harassment and the lack of response, the jury could reasonably have found that [the Director of the County Water Authority's] inaction and acquiescence to the harassment that [the plaintiff] suffered allowed the harassment to become the custom and practice, if not the policy, of the [County Water Authority].")  Thus, the evidence regarding the severity and scope of Foti's misconduct towards female inmates, in combination with the evidence of awareness of various aspects of that sexual misconduct by multiple Suffolk County employees within the Riverhead Facility (discussed *infra*), provides strong support (if credited by the jury) for plaintiffs' municipal liability claim.

**2. 1990s Internal Affairs Investigations of Foti's Misconduct**

With respect to the policymakers' awareness of Foti's misconduct, plaintiffs sought to demonstrate actual knowledge by a policymaker – namely, the Suffolk County Sheriff at the Riverhead Facility – of Foti's sexually inappropriate behavior based upon five formal complaints that were filed against Foti with Internal Affairs at the Riverhead Facility in the 1990s.[7] Plaintiffs note that each of these formal investigations about Foti was sent to the Sheriff who thus had actual notice of these incidents through these reports.

In concluding that this evidence has no probative value regarding whether the Sheriff was on notice of Foti's misconduct, the district court noted three of the reports – namely, (1) ███████████████████████████████████ ████████████████████████████████████ (2) Foti's ex-girlfriend's report in 1997 that he sexually harassed her; and (3) Foti's ex-fiancée's report that he harassed her between April 1998 and August 1998 – "hav[e] nothing to do with inmates or incidents at the jail where Foti worked." Sealed App'x at 264. The district court further explained, with respect to these three reports, that "[b]ecause these reports do not involve inmates, they cannot

---

[7] The district court found that the Sheriff had policymaking authority at the Riverhead Facility, and defendants do not dispute that finding on appeal.

establish that the Sheriff knew about—and ignored—any incidents of Foti sexually harassing inmates." *Id*. As to the remaining two reports, which do involve inmates, the district court concluded that the reports do not make reference to misconduct of a sexual nature, and thus could not be used to support any awareness by the Sheriff of Foti sexually assaulting or harassing inmates. Although the district court correctly identified some of the weaknesses and ambiguities of this category of proof as it relates to notice, we do not agree that it has no probative value on that issue when viewed in the light most favorable to plaintiffs, especially when examined in the context of the entire record.

First, the fact that three of these reports of sexual assault or sexual harassment by Foti were not alleged to have involved inmates or to have occurred at the Riverhead Facility does not mean that they would be irrelevant to his continued employment or to an investigation of alleged similar misconduct by Foti at the Riverhead Facility itself. As this Court has previously articulated, off-duty conduct can be relevant for establishing municipal liability. *See Vann v. City of New York*, 72 F.3d 1040, 1051 (2d Cir. 1995). The potential relevance of these off-duty allegations to this case was highlighted by the testimony of Internal Affairs investigator Theresa Pisciotta, in which she acknowledged that Foti's indictment

36

in the 1990s (with his ex-fiancée's minor daughter as the alleged victim) would have been relevant to her investigation into Foti's overall sexual misconduct even many years later.

Second, with respect to the Internal Affairs reports involving female inmates, a jury could reasonably infer that those reports, although not a model of clarity, related to inappropriate *sexual* misconduct with female inmates. With respect to the 1992 report regarding movement of a female inmate, Foti twice engaged in misconduct by failing to enter inmate movements in the logbook in connection with his removal of a female inmate from her housing unit for the purpose of cleaning the cellblock. Foti testified that he was accused of "do[ing] inappropriate things" with that inmate. Sealed App'x at 87. The investigation was closed with Foti receiving a Letter of Reprimand for failing to make logbook entries. Given that Foti was not asked to describe the nature of the alleged "inappropriate things" he was accused of doing with the female inmate, the district court concluded it had no relevance on the issue of notice in this case because "[t]here is no reason . . . to assume that the 'inappropriate things' Foti referred to were sexual." *Id*. at 265. With respect to the separate report in 1995 documenting an "allegation of fraternizing with an inmate" which was closed

with a "letter of warning and cautioning" to Foti, *id.* at 234, the district court similarly disregarded the report because the district court did "not agree with the plaintiffs that 'fraternizing' is the equivalent of sexual harassment," *id.* at 265. We do not believe that the potential relevance of these reports on the issue of notice can simply be cast aside because of these ambiguities. As an initial matter, we conclude that a jury could rationally infer – from Foti's description of being accused of doing "inappropriate things" with a female inmate and in light of the other evidence in this case – that the 1992 investigation of that conduct involved sexually inappropriate conduct. *Id.* In any event, each instance of alleged prior misconduct with female inmates need not be identical to those alleged here, or even rise to the level of sexual harassment, to have probative value on the issue of whether the recipient of that information (including a policymaker) would have had at least some level of notice that the municipal employee was engaging in unconstitutional sexual harassment of female inmates, especially when combined with the other evidence in the record.

Thus, we conclude that these reports, construed most favorably to plaintiffs and in the context of the entire record, are probative of whether the policymakers had prior notice of Foti's alleged sexual misconduct toward female inmates, and

38

their failure to properly investigate and act upon such notice. Notwithstanding the ambiguities in the record with respect to these incidents, plaintiffs should be able to ask the jury to rationally infer, especially by the time of the fifth report in 1999, that these reports collectively put the Sheriff on notice that Foti was the subject of serious allegations of sexual assault, sexual harassment, and inappropriate behavior toward female inmates both on-duty and off-duty, and that those allegations were not sufficiently investigated and addressed in order to ensure the future safety of female inmates at the Riverhead Facility.

In reaching this conclusion, we emphasize that this proof was not the cornerstone of plaintiffs' evidence with respect to their attempt to prove the existence of a municipal policy or custom of acquiescing to unconstitutional conduct by Foti toward female inmates. Instead, the bulk of plaintiffs' evidence (as discussed in detail *infra*) related to establishing that there was widespread knowledge among supervisors at the Riverhead Facility of Foti's sexual misconduct towards female inmates from 2009 to 2011 (when plaintiffs were incarcerated there), and that corresponding inaction by those supervisors provided a basis for concluding that the Riverhead Facility's policymakers, who ran the facility, had constructive notice of the misconduct. However, even in that

context, plaintiffs should be able to utilize these reports from the 1990s as background to attempt to demonstrate that the Sheriff's lack of response to the earlier allegations against Foti evidenced the beginning of a policy or custom of inaction and acquiescence that continued for well over a decade, which thereby placed female inmates at risk of subsequent unconstitutional conduct that is now alleged to have occurred years later with respect to the plaintiffs at the same Riverhead Facility. It is squarely within the province of the jury to decide, in determining municipal liability, what weight this evidence should receive on the issue of a policymaker's actual or constructive notice of the unconstitutional conduct in light of all the evidence in this case.

### 3. Evidence of Supervisory Awareness of Foti's Conduct

The district court also determined that plaintiffs' evidence of awareness by employees and supervisory officials at the Riverhead Facility of Foti's misconduct was insufficient as a matter of law to establish municipal liability by demonstrating that Suffolk County had a persistent and widespread practice of ignoring Foti's sexual harassment of female inmates. We disagree. Even assuming no direct evidence existed that any policymakers were aware of Foti's sexual misconduct towards female inmates in the 2009-2011 timeframe, we conclude that

40

the evidence in the record of awareness of such misconduct by supervisory non-policymakers was sufficient to raise disputed factual issues that preclude summary judgment on this claim.

Complaints by plaintiffs and other female inmates regarding sexual misconduct by Foti towards female inmates reached multiple Suffolk County officials at the Riverhead Facility with an investigatory and/or supervisory function regarding such allegations. The Riverhead Facility employee who was alleged to have had the most extensive knowledge of Foti's sexual misconduct against female inmates was Santacroce. According to Santacroce, he was an investigator who was appointed by the Sheriff to manage internal security, which consisted of ensuring the safety and security of the Riverhead Facility, including inmates. In opposition to defendants' summary judgment motion, plaintiffs pointed to their testimony, as well as that of other witnesses, that Santacroce was made aware on multiple occasions of Foti's sexual assaults and sexual harassment of female inmates and took no action, and in fact often retaliated against the inmate for complaining. For example, Lucente testified that, when she complained to Santacroce about Foti's brutal sexual assault of her, Santacroce ignored her complaint and simply told her to return to her housing unit. Lucente further

41

testified that Santacroce not only dismissed Lucente's plea for help, but also reprimanded her for coming forward by putting her in the maximum security unit. Similarly, Watts testified that, when she reported Foti's assaults to Santacroce, he responded, "[S]uck it up, it's jail." Sealed App'x at 10-11. Atkinson likewise testified that she tried to report Foti's sexual harassment and sexual assault to Santacroce, who in turn responded, "If you know what's best for you, you will keep your f***ing mouth shut." Redacted App'x at 212-13. And Andes testified that she approached Santacroce about Foti but he "shut [her] down" and told her that, unless she was reporting information about drugs at the Riverhead Facility, he did not wish to hear what she had to say. *Id.* at 150-51.

The parties vigorously dispute Santacroce's level of responsibility at the Riverhead Facility, with plaintiffs arguing that he was the Head of Security based upon testimony adduced by them, and Suffolk County countering that he was only an investigator. This dispute, however, is not dispositive with respect to the *Monell* claim because there is also substantial evidence that allegations of Foti's alleged sexual misconduct were reported to various supervisory personnel by both female inmates and other Suffolk County employees.

Sergeant Fisher was Foti's supervisor and, according to Foti, was designated as the sexual harassment officer at the Riverhead Facility. Suffolk County does not appear to contest that designation, but rather disputes that such a designation makes her a policymaker. *See* Appellees' Br. at 23. The record contains evidence of a number of instances in which Fisher received allegations of Foti fraternizing with female inmates, improperly touching them, and engaging in inappropriate relations with them, as well as making improper sexual comments towards them. For example, Fisher testified that, at some point prior to September 2011, an inmate reported that she believed Foti was having "inappropriate relations" with two female inmates. Sealed App'x at 94-95. Another inmate also told Fisher that Foti was "too touchy feely" with the female inmates, that he was a "pig," and that she did not want to work in an area with him. *Id.* at 99. Fisher testified that, at a weekly women's group where the female inmates could discuss various personal matters, an inmate told her that Foti would share his sexual preferences and experiences with women, including his experiences with his wife. On a separate occasion, another corrections officer reported to Fisher that she observed Foti massaging a female inmate. Fisher even admitted that she was aware that Foti's supervisors "had to correct [his behavior] so many times it was like being a mother

. . . you would be frustrated sometimes and just say, okay, you gotta stop." *Id.* at 106.

According to Fisher, she reported to her supervisor, Lieutenant McClurkin, several of the verbal complaints she received regarding Foti's inappropriate behavior and practices with respect to female inmates, including: (1) the complaint by an inmate, at some point prior to September 2011, that she believed Foti was having inappropriate relations with two female inmates; (2) Foti massaging the shoulders of a female inmate; (3) Foti's practice of calling down female inmates out of rotation to the law library and not following the schedule; and (4) Foti's practice of visiting the female inmates' tiers to notarize documents, rather than following the standard procedure of notarizing documents in the law library. Laton also testified that she reported her concerns about Foti's conduct to not only Fisher, but McClurkin as well.

Fisher acknowledged receiving complaints about Foti's behavior and testified that she took some remedial action to address them. For example, Fisher testified, upon learning of the complaint that Foti might be having inappropriate relations with female inmates, she called Foti into her office to discuss the allegations of the inappropriate behavior, but Foti completely denied them.

According to Fisher, when she learned about Foti's irregular procedures with female inmates regarding the law library, she and McClurkin told Foti he could no longer bring down female inmates to the library out of schedule; Foti said that instruction was "ridiculous" and that he "could decide when and who he wants to bring down." *Id.* at 96. According to Fisher, she also was present when McClurkin yelled at Foti for massaging an inmate's shoulders. Foti denied ever being confronted by a supervisor about inappropriate conduct towards female inmates. *Id.* at 83 ("Q. Did anyone ever tell you that you made any of the inmates feel uncomfortable? A. Never. Q. You never heard that from any of your supervisors? A. No. Q. Did any of your supervisors ever tell you that they believed you were acting in an inappropriate fashion? A. No.").

The district court found this evidence of supervisory knowledge and inaction insufficient to preclude summary judgment for two primary reasons. First, the district court noted that, regardless of any knowledge of Foti's sexual harassment of female inmates, plaintiffs had no evidence "that McClurkin or Fisher knew about the sexual *assaults*." *Id.* at 248 (emphasis added). Second, the district court noted that there was no evidence that Santacroce, Fisher, or McClurkin had policymaking authority or had been delegated such authority by

45

an individual with power to do so. *Id.* at 249-50. However, neither of those conclusions would support summary judgment on this claim given all the evidence in the record from which, when construed most favorably to plaintiffs, a rational jury could conclude municipal liability exists.

As an initial matter, although there was no evidence that Fisher or McClurkin were aware of the alleged sexual assaults by Foti of several female inmates, there was evidence that supervisory officials were placed on notice that two separate inmates were asserting that Foti had sexually assaulted them. Culoso testified that, a few days after Culoso's mother called the Riverhead Facility to complain about Foti's sexual assault of Culoso, an unnamed lieutenant visited Culoso in her housing unit and, after she recounted what Foti had done to her, the lieutenant advised her not to pursue a grievance against Foti. In addition, even though the district court stated that no formal grievances were filed, Atkinson testified that she filed a formal grievance about Foti's sexual assault and sexual harassment of her, which was never addressed by Suffolk County. Although there does not appear to be documentation of that grievance in the record, the lack of any documentation on this issue does not allow Atkinson's testimony to be discounted in assessing whether there is sufficient proof to overcome a summary

46

judgment motion. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) (concluding that "self-serving" affidavit alone created issue of fact precluding summary judgment). Thus, plaintiffs did adduce evidence that supervisory officials within the Riverhead Facility were made aware of allegations of Foti's sexual assaults on at least two female inmates. Moreover, Fisher was aware of allegations that Foti massaged an inmate's shoulders, and Foti admitted to such conduct, but claimed he did not think of it as inappropriate.

In any event, neither Fisher, McClurkin, nor any other supervisory employee need have been aware of a sexual *assault* to place them on notice as to Foti's unconstitutional conduct towards female inmates; rather, it is well-settled that sexual *harassment* also violates the Equal Protection Clause. *See Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir. 1994) ("Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer."); *see also Matusick*, 757 F.3d at 62 ("A custom or policy of harassment and other discriminatory acts giving rise to hostile work environment claims can form the basis of section 1983 claims."). Here, plaintiffs assert that Suffolk County's custom

of ignoring allegations of sexual assault and sexual harassment caused them to be subject to both forms of such unconstitutional conduct by Foti. Thus, the evidence in the record regarding awareness by Fisher, McClurkin, and other supervisory personnel at the Riverhead Facility of sexual harassment of female inmates by Foti can and should be considered in determining whether a Suffolk County policymaker was on notice as to Foti's unconstitutional conduct.

The same is true with respect to evidence of knowledge and inaction by multiple supervisors regarding Foti's pattern of fraternizing with the female inmates. The fact that Suffolk County Correctional Facility's Harassment Policy strictly forbids corrections officers from fraternizing with the female inmates demonstrates a recognition of the inherent safety risk of such fraternization to female inmates. *See* Redacted App'x at 253 ("Members of the Correction Division shall be forbidden to fraternize or converse with inmates on a personal basis. . . . They shall not discuss any subject non[-]conducive to the well-being of inmates as individuals or as a group."). Therefore, although fraternizing with female inmates may not itself rise to the level of unconstitutional conduct by a corrections officer, knowledge of such conduct by multiple supervisors and indifference to it may be highly probative, especially in the context of other evidence, as to (1) an awareness

48

of an extremely high risk that female inmates may be unconstitutionally sexually harassed or sexually assaulted by that corrections officer, and as to (2) the existence of a custom of failing to protect inmates from such unconstitutional conduct. For example, in *Cash v. County of Erie*, we held that a practice of allowing guards to have unmonitored one-on-one interactions with inmates of a different sex could have been rationally considered by the jury in finding that a failure to preclude or monitor such interactions demonstrated a municipal policy of deliberate indifference to prisoner safety, which allegedly resulted in the rape of the plaintiff by a guard:

> In concluding that trial evidence was legally insufficient . . . , the district court observed that a policy permitting unmonitored one-on-one interactions between a guard and a prisoner of different sexes was not itself unconstitutional, and that the lack of prior sexual *assaults* by male guards of female prisoners failed to alert [the Sheriff] to the fact that such a policy posed a risk of rape to [the plaintiff]. We take no exception to the district court's first observation, but we cannot agree with its second.

654 F.3d at 336 (emphasis in original) (citation omitted). We further explained that the district court erred in reasoning that the prior instances of sexual activity between inmates and guards gave no indication that such activities were assaultive, because it "overlook[ed] the fact that, as a matter of New York state law, *any* sexual contact between a guard and a prisoner is deemed non-consensual

49

due to the inherent power differential between guards and prisoners." *Id*. at 337

(emphasis in original); *see also J.K.J. v. Polk County*, 960 F.3d 367, 381-82 (7th Cir.

2020) (en banc) ("[The female inmates] were confined in circumstances where they

depended on male guards for nearly everything in their lives—their safety as well

as their access to food, medical care, recreation, and even contact with family

members. With this authority and control for the guards came power and, in turn,

access and opportunity to abuse it. It is difficult to conceive of any setting where

the power dynamic could be more imbalanced than that between a male guard

and a female inmate." (quotation marks omitted)), *petition for cert. filed*, No. 20-427

(U.S. Oct. 2, 2020).

Similarly, in the instant case, to establish the County's responsibility

plaintiffs are not limited to relying on supervisors' knowledge of sexual assaults

by Foti against female inmates. Rather, the supervisors' alleged inaction

(including the failure to discipline Foti) in response to all of Foti's alleged

misconduct toward female inmates, including, for instance, Foti's proscribed

fraternization with inmates, can be probative of their awareness of Foti's alleged

sexual assault and sexual harassment of female inmates (even when the

misconduct itself was not of a gravity or pervasiveness to be considered

unconstitutional). *See Cash*, 654 F.3d at 337 ("[K]nowledge that an established practice has proved insufficient to deter lesser [sexual] misconduct can be found to serve notice that the practice is also insufficient to deter more egregious misconduct."); *see also J.K.J.*, 960 F.3d at 382 ("A reasonable jury could have viewed the County's learning of [a correctional officer's] sexual exploitation of [the female inmate] as sounding an institutional alarm, making it highly predictable, if not certain, that a male guard would sexually assault a female inmate if the County did not act. By that point the risk was not only obvious, but blatantly so. To be certain, the accusations of [the corrections officer's] reprehensible conduct fell short of rape. But it would be naive in the extreme to dismiss the misconduct as no more than boorish behavior or, more to it, providing no incremental notice of an obvious risk." (internal quotation marks omitted)); *Gonzales v. Martinez*, 403 F.3d 1179, 1187 (10th Cir. 2005) (finding that, in connection with a claim that jail administrator sexually assaulted the plaintiff inmate, Sheriff's knowledge of substantial risk of harm to inmates could be determined based upon, among other things, his "knowledge of reported risks to inmate health or safety, including the documented lapse of security in the control room, [and] complaints of sexual harassment and intimidation").

The district court also erred in concluding that any evidence of knowledge of Foti's misconduct by Fisher and McClurkin was insufficient as a matter of law to trigger municipal liability because neither of these Suffolk County employees was a legislatively authorized policymaker nor was delegated policymaking authority. The legal standard for *Monell* liability is not that narrow. As noted *supra*, the Supreme Court has made clear that, if a practice is "so persistent and widespread as to practically have the force of law," *Connick*, 563 U.S. at 61, actual notice by the policymakers need not be proven. In *Praprotnik*, the Supreme Court explained the reasoning behind this theory of municipal liability:

> [W]hatever analysis is used to identify municipal policymakers, egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by a separate doctrine. Relying on the language of § 1983, the Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law. That principle, which has not been affected by *Monell* or subsequent cases, ensures that most deliberate municipal evasions of the Constitution will be sharply limited.

485 U.S. at 127 (internal quotation marks and citations omitted). We therefore have held that "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the

municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980); *see also Krulik*, 781 F.2d at 23 ("[A]n individual official's acts can rise to the level of 'policy' when 'senior personnel' knowingly 'acquiesce' in their subordinates' behavior.").

We recognize that, under this theory of *Monell* liability, "even if a policy can be inferred from omissions of a municipality, such as where it acquiesces in a pattern of illegal conduct, such a policy cannot be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality"; instead, there must be "more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct." *Turpin*, 619 F.2d at 201-02.

In the instant case, construing the evidence most favorably to plaintiffs, (1) a lieutenant was made aware of Foti sexually assaulting Culoso in or about January 2010; (2) Atkinson filed a formal complaint regarding Foti's sexual assault of her in 2010; (3) at some point prior to September 2011, the sexual harassment officer (who was a sergeant) was made aware of Foti's sexual harassment of female inmates and also knew that Foti's supervisors "had to correct [his behavior] so many times it was like being a mother . . . you would be frustrated sometimes and

just say, okay, you gotta stop," Sealed App'x at 106; and (4) after she received that information, the sexual harassment officer reported some of the alleged misconduct to her supervisor (a lieutenant) on several occasions. Although there is some evidence that Foti was confronted about his sexual harassment, Foti denied that he was ever even approached about inappropriate behavior, and there is no evidence that the allegations of assaults were ever investigated. Thus, if plaintiffs' evidence is credited, it would allow a jury to rationally find that, notwithstanding the awareness by supervisory personnel of these allegations of a pattern of misconduct by Foti towards female inmates, no action was taken in response to any of the inmates' complaints. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (concluding that an inference of a municipal policy can be drawn from circumstantial evidence, including "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation" into allegations of unconstitutional conduct).

On this critical question, the existence of disputed material facts, which are unsuitable for resolution on summary judgment, is further highlighted by the evidence in the record of Internal Affairs reports from the 1990s outlining sexual misconduct and related inappropriate behavior by Foti towards female inmates,

both on-duty and off-duty.  Thus, given the totality of the evidence in this case, a jury should decide whether the supervisory personnel with such alleged knowledge are sufficiently senior, and whether the pattern of unconstitutional conduct by Foti and alleged inaction by supervisory personnel was sufficiently persistent and widespread, to allow an inference of policymaker acquiescence that would trigger *Monell* liability.[8]

Our conclusion on this issue is consistent with our other decisions addressing analogous factual circumstances.  For example, in *Matusick*, in upholding a jury verdict, we held that there was a sufficient basis for finding *Monell* liability based upon the "pervasiveness of the harassment" and "the lack of response" from the municipality that could amount to "inaction and acquiescence to the harassment."  757 F.3d at 63.  In that case, the plaintiff's complaints of harassment were not raised with a policymaker, but rather the Coordinator of Employee Relations and the Director of Human Resources. *Id*. We concluded that the latter supervisor's "high-level position . . . and her failure to address the harassment supports an inference that [the policymaker whom she reported to]

---

[8] Given this holding, we need not address plaintiffs' alternative argument that *Monell* liability can be based upon record evidence that supports a finding that Fisher and Santacroce were policymakers.  This of course does not prevent plaintiffs from attempting to establish that proposition in the proceedings on remand.

also knew of the harassment and allowed for the conduct to become the accepted custom or practice of the [municipality]." *Id.*; *accord Doe 1 v. City of Chicago*, No. 18 C 3054, 2020 WL 1166222, at *2 (N.D. Ill. Mar. 11, 2020) (noting that, although there was no evidence that the policymaker was aware of sexual harassment of female paramedics, evidence of a "widespread practice of sex discrimination" precluded summary judgment on the *Monell* claim); *DelGadillo v. Town of Cicero*, No. 11 C 7342, 2015 WL 1502410, at *8 (N.D. Ill. Mar. 27, 2015) (finding that, although the plaintiff failed to produce evidence that a policymaker had knowledge of harassment of a female firefighter, summary judgment was unwarranted on the *Monell* claim because of evidence of a "widespread policy or practice of tolerating discrimination and harassment"); *see also Doe C.D. v. Career Tech. Ctr. of Lackawanna Cnty.*, No. CV 3:20-0088, 2020 WL 1165837, at *22 (M.D. Pa. Mar. 11, 2020) (denying motion to dismiss *Monell* claim where it was alleged that administrators were aware of a teacher's "open and widespread sexual abuse and harassment of his male minor students," even though there was no allegation of actual knowledge of abuse by policymakers).

As in *Matusick*, plaintiffs here have presented evidence that raises genuine issues of material fact as to whether Suffolk County supervisory officials had

knowledge of Foti's alleged widespread unconstitutional conduct sufficient to create an official policy or custom of inaction through actual or constructive notice of (and constructive acquiescence to) that conduct. The district court erred in concluding otherwise.[9]

## C. § 1983's Statute of Limitations and the Continuing Violation Doctrine

The district court also held that all of Lucente and Culoso's claims under § 1983, including their claims against individual defendants Foti and Santacroce, were time-barred. Specifically, the district court concluded that, because the *Monell* claim did not survive summary judgment, there was no discriminatory practice to which the continuing violation doctrine could apply. Moreover, the district court determined that neither Lucente nor Culoso had alleged any

---

[9] Suffolk County also contends that the lack of evidence of causation supports summary judgment. As an initial matter, Suffolk County failed to raise this causation issue in their summary judgment motion before the district court, and thus may not raise it on appeal. *See Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal."). In any event, we find that argument unpersuasive. For purposes of a § 1983 claim under *Monell*, a plaintiff must demonstrate a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385. This standard, which is described later in *Canton* as a requirement that the municipal policy "actually caused" the constitutional deprivation, *id.* at 391, supports liability here because there is more than sufficient evidence in the record from which a rational jury could conclude that the alleged failure by Suffolk County to address Foti's pattern of sexual misconduct towards female inmates was an actual cause of some of Foti's unconstitutional assaults and harassment of plaintiffs. Accordingly, summary judgment on the causation issue is also unwarranted.

unconstitutional act against them that occurred within the applicable limitations period. Because the continuing violation doctrine can apply to plaintiffs' claims and because there is evidence that would allow the jury to conclude that at least some of Foti's alleged unconstitutional conduct towards Lucente and Culoso occurred within the limitations period, summary judgment should not have been granted on timeliness grounds.[10]

The statute of limitations for § 1983 actions arising in New York is three years. *See Owens v. Okure*, 488 U.S. 235, 250-51 (1989); *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). Here, plaintiffs filed their complaint on March 28, 2013; therefore, to be timely, Lucente and Culoso's claims must have accrued on or after March 28, 2010. However, the threshold question is whether the continuing violation doctrine can be applied to Lucente's and Culoso's claims.

The continuing violation doctrine, where applicable, provides an "exception to the normal knew-or-should-have-known accrual date." *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999). It applies to claims "'composed of a series of separate acts that collectively constitute one unlawful . . . practice.'" *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (quoting *Nat'l R.R. Passenger*

---

[10] Defendants did not argue in the district court, nor do they argue on appeal, that Viola's claims were untimely.

*Corp. v. Morgan*, 536 U.S. 101, 111 (2002)). The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of "serial violations," but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment. *Morgan*, 536 U.S. at 114-15. Accordingly, where the continuing violation doctrine applies, the limitations period begins to run when the defendant has "engaged in enough activity to make out an actionable . . . claim." *Id.* at 117. A claim will be timely, however, only if the plaintiff "allege[s] . . . some non-time-barred acts" contributing to the violation. *Harris*, 186 F.3d at 250. Although the doctrine is utilized most often in connection with certain Title VII claims, its application is not limited to that context. This Court, for example, has applied the doctrine to various constitutional claims brought under § 1983. *See, e.g., Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 291-92 (2d Cir. 2013) (applying doctrine to Equal Protection claim); *see also Sherman v. Town of Chester*, 752 F.3d 554, 566-67 (2d Cir. 2014) (applying doctrine to an unlawful takings claim); *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009) (applying doctrine to Eighth Amendment deliberate indifference claim). To trigger the continuing violation doctrine in the context of an Equal Protection claim, a plaintiff "must allege both the existence of an ongoing

policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Fahs*, 725 F.3d at 292 (internal quotation marks omitted). More specifically, as it relates to a *Monell* claim, a plaintiff "will need to allege the persistence of the municipal policy and non-time-barred acts indicating the acquiescence of policy-making officials in subordinates' misconduct." *Shomo*, 579 F.3d at 185.

As discussed *supra*, plaintiffs have presented sufficient evidence to create a genuine dispute of material fact as to the existence of an ongoing discriminatory policy by Suffolk County over several years (arguably decades) of ignoring and/or inadequately addressing Foti's sexual misconduct with female inmates. Moreover, there is evidence that Foti's persistent and widespread misconduct towards female inmates, as well as Suffolk County's alleged policy of acquiescence with respect to that misconduct, continued well after March 28, 2010, and thus within the three-year statute of limitations period. For example, there is non-time-barred evidence that Foti sexual assaulted Andes in May or June 2010. Further, there is evidence within the limitations period that, consistent with Suffolk County's alleged policy of acquiescence, Santacroce rejected Andes's efforts to report Foti's ongoing sexual misconduct. *See, e.g.*, Redacted App'x at 151, 194

(Andes's sworn statement that, "a month or two" after Foti assaulted her in May or June 2010, she tried to report Foti's misconduct to Santacroce, but was told "[u]nless [she] was in his office to give him information about drugs being brought in, he didn't want to hear anything [she] had to say"). In short, construing the evidence in the record most favorably to plaintiffs, a rational jury could find, under the continuing violation doctrine, "the persistence of the municipal policy and non-time-barred acts indicating the acquiescence of policy-making officials in subordinates' misconduct." *Shomo*, 579 F.3d at 185.

The continuing violation doctrine can also apply to Lucente's and Culoso's separate § 1983 claims against individual defendants Foti and Santacroce as long as each plaintiff alleged an unconstitutional act committed by each particular defendant that falls within the three-year statutory period. *See id*. at 183 ("The continuing violation doctrine does not apply to the claim against [the individual defendant] because there is no indication that [the plaintiff] is able to allege acts involving [that defendant] that fall within the three-year statutory period."). On that issue, we disagree with the district court's determination that "neither

Lucente nor Culoso allege[d] that Foti assaulted them after March 28, 201[0]."[11]

Sealed App'x at 251. Culoso testified that Foti sexually harassed and sexually assaulted her during the course of her incarceration at the Riverhead Facility, which spanned from August 2009 through December 2010. In her deposition, Culoso testified that the sexual assault occurred in the law library about two weeks before she left the Riverhead Facility, and her departure took place in December 2010, which would place this alleged unconstitutional act within the limitations period. Defendants note that, at other points in her deposition, Culoso testified that the sexual assault occurred in January 2010. The inconsistencies in the deposition testimony regarding the date, however, should not be resolved in defendants' favor on their summary judgment motion, but rather pose a credibility issue that should be resolved at trial. *See Patrick v. LeFevre*, 745 F.2d 153, 160 (2d Cir. 1984) (concluding that conflicting testimony in a deposition should not be resolved on summary judgment). In other words, construing the testimony most favorably to Culoso as we are required to do on a motion for summary judgment, there exists, at the very least, a genuine dispute of material fact as to whether the

---

[11] The district court opinion included a typographical error, which referenced the commencement of the statute of limitations period as March 28, 2013, but the correct year is 2010.

alleged sexual assault occurred within the statute of limitations period. In any event, separate from the alleged sexual assault, Culoso also testified to persistent and ongoing sexual harassment by Foti during her time at the Riverhead Facility until December 2010. Specifically, Culoso testified to Foti's growling and clawing at her in a sexual manner each time he saw her during her entire time at the Riverhead Facility, and that such conduct occurred "all the time." Sealed App'x at 182. That ongoing sexual harassment, if proven to have continued into the limitations period, could also provide a separate basis for a timely claim under the continuing violation doctrine. Therefore, given these disputed issues of fact, Culoso's claims should not have been dismissed as untimely on summary judgment.

Similarly, the district court should not have dismissed Lucente's claims as barred by the statute of limitations. Lucente testified that Foti's sexual harassment against her was persistent and ongoing until she left the Riverhead Facility in July 2010. For example, Lucente testified that Foti would open his legs, rub his crotch, wag his tongue, and growl at her up until the time she left the Riverhead Facility, and she characterized that conduct as "relentless." Redacted App'x at 248. Because Lucente proffered sufficient evidence of sexually harassing acts by Foti

63

that a rational jury could find fell within the statute of limitations period, her claims against him individually, like the *Monell* claim, should not have been dismissed on summary judgment.

In sum, because there is evidence upon which the continuing violation doctrine can apply as to all of the § 1983 claims in this case, and because there is evidence of a sexual assault and/or sexual harassment by Foti against Lucente and Culoso within the limitations period, their claims should not have been dismissed as untimely on summary judgment, and must proceed to trial.[12]

### D.    The PLRA and Failure to Exhaust on Viola's Claims

Finally, the district court dismissed Viola's claims for failure to exhaust under the PLRA.  Although it was undisputed that Viola never filed a grievance, Viola argues that she satisfied the exhaustion requirement because the

---

[12] Although defendants do not separately argue that the individual claims against Santacroce are untimely, the Court concludes that summary judgment on those claims on timeliness grounds is also unwarranted.  As noted above, there is evidence in the record that, during the limitations period, Santacroce furthered Foti's unconstitutional conduct by, among other things, retaliating against female inmates who complained of sexual harassment by Foti.  For example, Atkinson testified that she was told by Santacroce: "If you know what's best for you, you will keep your f***ing mouth shut."  Sealed App'x at 210.  Atkinson testified that this encounter with Santacroce occurred after Foti assaulted Andes, which Andes stated occurred in May or June 2010.  Thus, Santacroce's alleged retaliation against complaining inmates within the limitations period could be found by a jury to have facilitated Foti's ongoing sexual harassment of Lucente, Culoso, and others and provided a basis for personal liability against him under § 1983.  *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996).

administrative process was unavailable to her due to defendants' intimidation and retaliation. Given the lack of any evidence that the administrative process was unavailable to Viola due to threats or any other form of intimidation, we agree with the district court that the PLRA bars Viola's claim.

The PLRA was enacted to "curtail what Congress perceived to be inmate abuses of the judicial process." *Ortiz v. McBride*, 380 F.3d 649, 658 (2d Cir. 2004). The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA requires "proper exhaustion" of administrative remedies, meaning exhaustion in "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006); *see also Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007). However, prisoners are exempt from the exhaustion requirement when administrative remedies are "unavailable." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). An administrative procedure may be unavailable when (1) "'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'"; (2) it is "'so opaque that it becomes, practically

speaking, incapable of use'"; or (3) "'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Williams v. Priatno*, 829 F.3d 118, 123-24, 123 n.2 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859-60). We have held that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004) (internal quotation marks omitted), *abrogated on other grounds by Ross*, 136 S. Ct. at 1850). On this issue, we have noted that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *Id*.

We note that, although there is evidence that other plaintiffs faced retaliation for complaining about Foti's conduct towards them, there is no evidence that Viola was ever made aware of any of those instances of alleged retaliation. Here, Viola has alleged no more than a generalized fear of retaliation which is insufficient as a matter of law to support a finding that the grievance

process was unavailable in order to overcome her failure to exhaust administrative remedies under the PLRA. Viola asserts that she was afraid to report Foti's conduct because of her fear of the ongoing danger of being further sexually assaulted and sexually harassed by Foti, and because she had learned about the beating of a female inmate at the Riverhead Facility by at least two corrections officers.[13] As to the latter concern, Viola stated that, sometime in March 2010, she learned from several inmates that corrections officers broke that female inmate's nose, knocked out her two front teeth, and then attempted to cover up the abuse.

However, neither of those fears related to threats or intimidation in connection with the grievance process itself. Viola was never threatened, or even warned, by Foti or anyone else, not to complain or file a grievance, and Viola did not attempt to report Foti's misconduct to any official. Foti's alleged sexual harassment and sexual assault of Viola, as serious as those allegations are, would

---

[13] Suffolk County notes that Viola testified that she was unaware of the grievance process at the Riverhead Facility but that, if she had known about it, she would not have filed a grievance because of fear of retaliation. Suffolk County thus contends that, "[s]ince Viola has admitted that she was unaware of a grievance process at the jail, any claim that she was deterred from filing a grievance based upon a generalized fear is wholly speculative." Appellees' Br. at 42. However, because *Hemphill* utilizes an objective test for determining the availability of the grievance process, and that test is not satisfied here, we need not address this alternative argument that a plaintiff must have been aware of the grievance process in the first place in order to argue that her failure to exhaust that process was due to intimidation.

not necessarily alone provide a legal basis to conclude that the entire grievance process was unavailable to Viola. To hold otherwise would allow any inmate who was claiming that a prison guard violated § 1983 based upon an act of violence or other hostile act in the jail to avoid the PLRA exhaustion requirement because of a generalized fear that any grievance or complaint could lead to more violence by that guard. Neither the Supreme Court nor this Court has ever interpreted unavailability of the grievance process to be applied so broadly, and such an interpretation would thwart the language and purpose of the PLRA. *See generally McBride v. Lopez*, 807 F.3d 982, 988 (9th Cir. 2015) ("There is no reason to allow inmates to avoid filing requirements on the basis of hostile interactions with guards when the interaction has no apparent relation to the use of the grievance system. Hostile interaction, even when it includes a threat of violence, does not necessarily render the grievance system 'unavailable.'"). In the absence of evidence that the administrative remedies process is unavailable to inmates, the PLRA properly incentivizes inmates to seek remediation of their grievances through the prison system in the first instance, as prison officials are best situated to efficiently remedy those grievances without the need for protracted litigation.

With respect to Viola's alleged awareness of the attack by corrections officers on another female inmate, we emphasize that a plaintiff inmate's knowledge of threats or violence against another inmate by prison officials could plausibly constitute intimidation that would satisfy the objective standard where that conduct was based upon a grievance or complaint raised by that other inmate or could reasonably be viewed, in light of the full circumstances, as an attempt to silence that inmate or others. *See, e.g.*, *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 793 (9th Cir. 2018) (holding that a reasonable fear of retaliation made the grievance process unavailable where, *inter alia*, a plaintiff filed a declaration stating that "he knew from his personal experience that other inmates had been beaten for filing grievances and that he had heard that anyone who complained about the beating that occurred during the cell extractions would face retaliation").

That is not the situation here. Viola has not demonstrated any connection between the alleged beating of another female inmate and her alleged inability to report Foti's conduct. Viola did not contend that the alleged beating of a female inmate by the corrections officers was done in retaliation for the inmate attempting to utilize the grievance process or was part of an effort to silence the inmate from making a complaint of some type; rather, Viola stated in her affidavit that she

understood that the inmate was beaten "because she disobeyed their instructions to go to court." Redacted App'x at 49, 216. Therefore, that alleged violent act against another inmate, wholly unrelated to the grievance process or any attempt to intimidate an inmate from reporting abuse, does not provide grounds for excusing Viola's failure to comply with the PLRA's exhaustion requirement. *See, e.g.*, *McBride*, 807 F.3d at 988 ("Although the threat need not explicitly reference the grievance system in order to deter a reasonable inmate from filing a grievance, there must be some basis in the record from which the district court could determine that a reasonable prisoner of ordinary firmness would have understood the prison official's actions to threaten retaliation if the prisoner chose to utilize the prison's grievance system." (internal citation omitted)); *see also Rinaldi v. United States*, 904 F.3d 257, 267 (3d Cir. 2018) ("We agree that serious threats of substantial retaliation can trigger this third category of unavailability [under *Ross*], and thus join our Sister Circuits who have held, even before *Ross*, that administrative remedies are not 'available' under the PLRA where a prison official inhibits an inmate from resorting to them through serious threats of retaliation and bodily harm." (citing *Hemphill* and other cases)).

Given that Viola did not point to any evidence of intimidation that would have deterred a similarly situated individual of ordinary firmness from utilizing the grievance procedures at the Riverhead Facility, the district court properly dismissed her claims for failure to exhaust administrative remedies under the PLRA.

## IV. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment as to Viola's claims, but **VACATE** as to the dismissal of Lucente and Culoso's claims against Suffolk County, Santacroce, and Foti, and **REMAND** the case to the district court for proceedings consistent with this opinion.